Judith BROCHU and Emmanuel T.
Brochu, Plaintiffs-Appellees,

v.

**ORTHO PHARMACEUTICAL
CORPORATION,**
Defendant-Appellant.

No. 80–1077.

United States Court of Appeals,
First Circuit.

Reargued Jan. 5, 1981.

Decided March 3, 1981.

On Motion For Certification Or Petition
For Rehearing and Rehearing En Banc
Denied April 7, 1980.

David F. Dobbins, New York City, with whom George S. Frazza, New Brunswick, N. J., Karl E. Seib, Jr., Theodore B. Van Itallie, Jr., Robert W. Sparks, Patterson, Belknap, Webb & Tyler, New York City, and Sulloway, Hollis & Soden, Concord, N. H., were on brief, for defendant-appellant.

Ronald L. Snow, Concord, N. H., with whom Mary Susan Leahy and Orr & Reno, P.A., Concord, N. H., were on brief, for plaintiffs-appellees.

Before ALDRICH, BOWNES, and BREYER, Circuit Judges.

BOWNES, Circuit Judge.

This is a civil action based on diversity of citizenship brought in the United States District Court for the District of New Hampshire by Judith Brochu and her husband Emmanuel, residents of the state of New Hampshire, against the Ortho Pharmaceutical Corporation (Ortho), a New Jersey corporation. In their complaint the Brochus alleged that Mrs. Brochu sustained serious bodily injury as a result of taking a type of oral contraceptive, Ortho-Novum 2 mg., manufactured by Ortho. Mr. Brochu also claimed damages for loss of consortium and past and future expenses resulting from his wife's injuries. Their suit was based on four separate theories: Negligence, strict liability, fraudulent misrepresentation, and negligent misrepresentation. The Brochus withdrew both negligence claims before the case reached the jury. Ortho appeals the jury verdict of $600,000 for Mrs. Brochu and $100,000 for her husband on the following grounds: that the case was tried on an erroneous theory of strict liability; that the warnings given were adequate as a matter of law; that submission of the fraudulent misrepresentation claim to the jury was prejudicial be-

cause there was no evidence to support it; that the jury charge improperly intermingled concepts of strict liability and negligence; and that the judge did not give proper guidance to the jury on the question of discounting of damages.

## FACTS

Judith Brochu first started using an oral contraceptive on August 29, 1967. The birth control pill prescribed by her physician, Dr. A. Craig Campbell, was the Ortho-Novum 2 mg. tablet, which is composed of 2 mg. of a synthetic progestogen and 100 mcg. of a synthetic estrogen.[1] Mrs. Brochu used this brand of oral contraceptive until November 14, 1971; the next day she suffered a cerebral thrombosis that initially left her totally paralyzed on her left side. Before her stroke, Mrs. Brochu, who was twenty-seven years old and the mother of a young child, was employed as a hairdresser. According to her testimony at trial, she enjoyed an active family and social life. Expert testimony established that, as a result of the cerebral thrombosis, Mrs. Brochu, who is left-handed, does not have functional use of her left hand or arm and suffers from a lesion of the right ulna nerve and a carpal tunnel syndrome on the right side. Other direct or indirect effects of the stroke include epileptic-like seizures, depression, and difficult breathing and swallowing.

## STRICT LIABILITY IN TORT

The Brochus have alleged two claims under the doctrine of strict liability:

1. By 1971 Ortho was marketing other oral contraceptives containing less estrogen, which, like the Ortho-Novum 2 mg. pill, were 99% effective, but presented much less risk to the user than the Ortho-Novum 2 mg. pill. Therefore the 2 mg. oral contraceptive with its higher estrogen level was defectively designed and unreasonably dangerous.

2. Because it did not withdraw the 2 mg. pill from the market, Ortho should have warned physicians that this product posed a much higher risk of cerebral thrombosis than other lower-estrogen-dosage products. The failure to do so made the product defective and unreasonably dangerous.

New Hampshire has adopted the doctrine of strict liability. *Buttrick v. Arthur Lessard & Sons, Inc.*, 110 N.H. 36, 38, 260 A.2d 111, 113 (1969); *Elliott v. Lachance*, 109 N.H. 481, 484, 256 A.2d 153, 155–56 (1969). In allowing a cause of action under strict liability in *Buttrick*, the New Hampshire Supreme Court quoted section 402A of the Restatement (Second) of Torts, which provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

110 N.H. at 38; 260 A.2d at 38–39.

### A. Design Defect

New Hampshire recognizes defective design as a basis for a strict liability claim. *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 807, 395 A.2d 843, 846 (1978). In *Thibault* the New Hampshire Supreme

---

1. Ortho manufactured four other oral contraceptives at the time Mrs. Brochu suffered her stroke: Ortho-Novum 10 mg., which contained 10 mg. of progestogen and 60 mcg. of estrogen; Ortho-Novum sequential, which contained 2 mg. of progestogen and 80 mcg. of estrogen; Ortho-Novum 1/80, which contained 1 mg. of progestogen and 80 mcg. of estrogen; and Ortho-Novum 1/50, which contained 1 mg. of progestogen and 50 mcg. of estrogen.

Court stated that "[a] design defect occurs when the product is manufactured in conformity with the intended design but the design itself poses unreasonable dangers to consumers." *Id.* New Hampshire, however, has never considered the design defect theory in the context of an ethical drug case. In determining the result we believe the New Hampshire court would reach if presented with that issue, we consider the decisions of other state and federal courts and the general weight of the authority. *Rigby v. Beech Aircraft Co.*, 548 F.2d 288, 291 (10th Cir. 1977); *Julander v. Ford Motor Co.*, 488 F.2d 839, 844 (10th Cir. 1973).

In *Thibault* the New Hampshire Supreme Court outlined what the plaintiff in a defective design strict liability case must prove to prevail. Initially, the plaintiff must demonstrate "the existence of a 'defective condition unreasonably dangerous to the user.'" 118 N.H. at 807, 395 A.2d at 846; *accord*, Restatement (Second) of Torts § 402A(1). Courts are to consider the social utility and desirability of the product as well as its danger in determining if it is unreasonably dangerous. *Thibault* noted that "[s]ome products are so important that a manufacturer may avoid liability as a matter of law if he has given proper warnings." 118 N.H. at 807, 395 A.2d at 846.

In its brief, Ortho strenuously objects to the Brochus' theory that a drug, specifically Ortho-Novum 2 mg., might be unreasonably dangerous, with or without warnings.[2] It

calls their design defect argument a "semantic ploy." We disagree. We are unwilling to say that under New Hampshire's balancing test no drug can ever be classified as unreasonably dangerous. We do not believe, as Ortho contends, that the New Hampshire Supreme Court would necessarily limit the application of *Thibault* to mass-produced items sold over the counter.

In *Thibault* the New Hampshire court listed several factors to consider in balancing product utility and danger. One consideration is whether the risk could have been lessened without significantly affecting effectiveness or cost. The court noted that "liability may attach if the manufacturer did not take available and reasonable steps to lessen or eliminate the danger of even a significantly useful and desirable product." *Id.* Under New Hampshire law, "when an unreasonable danger could have been eliminated without excessive cost or loss of product efficiency, liability may attach even though the danger was obvious or there was adequate warning." *Id.* 118 N.H. at 808, 395 A.2d at 847. We think that plaintiffs' first claim based on a design defect inherent in the high content of estrogen and the danger resulting from it states cause of action in strict liability under New Hampshire law.[3] Ortho has limited its challenge on this claim to its legal basis. We, therefore, note only that there were evidentiary grounds to support a jury finding of liability on this claim.[4]

2. Counsel for the defendant looks to the Second Circuit decision in *Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87 (2d Cir. 1980) for support for its theory that a design defect claim is governed by a negligence standard. It suffices for present purposes to point out that *Lindsay* did not consider the theories advanced here.

3. *See* Keeton, *Products Liability—Inadequacy of Information*, 48 Tex.L.Rev. 398, 410 (1970) (selling product may be unreasonable if adequate, less dangerous substitute available).

4. Two of plaintiffs' experts testified that the 100 mcg. pill offered no advantage over lower doses. Defendant chose not to cross-examine on this point. There was uncontroverted testimony that all of defendant's oral contraceptives of varying dosages then on the market were equally effective in preventing concep-

tion—about 99%. There was also testimony that women on lower dosages may experience breakthrough bleeding, which may disappear with the higher dose. This topic was surprisingly little explored, with little record evidence as to the likelihood that the higher dose will prevent it. Such evidence as there was suggested that breakthrough bleeding, while a nuisance, is not a serious health risk. To the extent that defendant now purports to elaborate on the issue in its brief and at oral argument, it comes late. The evidence before the jury permitted it to find that the increased health risk posed by the 100 mcg. pill outweighed whatever advantages, if any, it might have had over lower dosages—in other words, that the Ortho-Novum 2 mg. pill was unreasonably dangerous.

## B. *Warning*

■ Another consideration specified by *Thibault* is the presence or absence of warnings: when the risk is not apparent, "the user must be adequately and understandably warned of concealed dangers." *Id.* 118 N.H. at 808; 395 A.2d at 846. In cases involving ethical drugs, the manufacturer must warn the physician, not the patient. *E. g., Reyes v. Wyeth Laboratories*, 498 F.2d 1264, 1276 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Basko v. Sterling Drug Co.*, 416 F.2d 417, 426 (2d Cir. 1969); *Ortho Pharmaceutical Corp. v. Chapman*, 388 N.E.2d 541, 548 (Ind.App.1979).

As noted, *Thibault* also pointed out that some products are so important that liability may be avoided as a matter of law if adequate warnings are given. Plaintiffs claim that Ortho's warnings were inadequate because, although the company knew that there was a significantly higher risk of cerebral thrombosis from ingesting Ortho-Novum 2 mg. than from ingesting lower-dosage oral contraceptives, it did not so inform physicians. We have previously held that "having embraced strict liability, the New Hampshire court would . . . [impose] upon a drug manufacturer an affirmative duty to warn the medical profession of . . . dangerous side effects." *McCue v. Norwich Pharmacal Co.*, 453 F.2d 1033, 1035 (1st Cir. 1972).

Although not specifically cited in *Thibault*, the New Hampshire Supreme Court presumably based this duty to warn on Comment k to the Restatement (Second) of Torts, section 402A,[5] which provides:

k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Restatement (Second) of Torts § 402A, Comment k (1965).

---

5. The New Hampshire court relied on Comment k in determining that the issue of whether a product is unreasonably dangerous to the ordinary consumer must be decided on the knowledge of the adult buyer, not of the child user. *Bellotte v. Zayre Corp.*, 116 N.H. 52, 54–55, 352 A.2d 723, 725 (1976). In discussing the use of warnings to avoid liability, the *Thibault* court cited two cases which found that under Comment k an unavoidably unsafe product such as a drug is neither defective nor unreasonably dangerous under section 402A if the manufacturer gives adequate warning of the risks. 118 N.H. at 807, 395 A.2d at 846 (citing *Basko v. Sterling Drug, Inc.*, 416 F.2d 417, 425 (2d Cir. 1969), and *Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121, 128–29 (9th Cir. 1968)).

Basing a strict liability claim on both design defect and inadequate warning is neither illogical nor inconsistent.[6] The example given in Comment k itself—the Pasteur rabies vaccine—suggests a balancing: certain death is weighed against the high degree of risk posed by the treatment itself.[7] If the danger is unnecessary, the product, regardless of its utility, is defective. If, as Comment k explains, the danger is unavoidable and the utility is great, liability may be avoided with proper warnings.[8]

The Fifth Circuit has utilized a similar analysis applying Texas law in a case in which the plaintiff's child contracted polio after receiving the Sabin oral polio vaccine. *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.), *cert. denied*, 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974).[9] The court first asked if the vaccine itself was so unsafe that marketing it at all was "unreasonably dangerous per se." *Id.* at 1273. Such a conclusion is warranted only "if the potential harmful effects of the product— both qualitative and quantitative—outweigh the legitimate public interest in its availability." *Id.* at 1274. If the product is not unreasonably dangerous per se, the court then inquires if the product is "unreasonably dangerous as marketed." *Id.* According to the *Reyes* opinion, under section 402A and Comment k of the Restatement,

"a seller who has reason to believe that danger may result from a particular use of his product" must provide an adequate warning. *Id.* at 1275. Failure to warn in such circumstances constitutes a defect in the product, making it unreasonably dangerous as marketed. *Id.*

An adequate warning is one reasonable under the circumstances. *Sterling Drug, Inc. v. Yarrow*, 408 F.2d 978, 992, 993 (9th Cir. 1969); *Ortho Pharmaceutical Corp. v. Chapman*, 388 N.E.2d at 553. A warning may be inadequate in factual content, in expression of the facts, or in the method by which it is conveyed. *Ortho Pharmaceutical Corp. v. Chapman*, 388 N.E.2d at 552.

The adequacy of the warning must be judged in the light of what Ortho knew at the time Mrs. Brochu was actually taking Ortho-Novum 2 mg.[10] The key document in this determination is a study conducted by Inman, Vessey, Westerholm, and Engelund and published in the British Medical Journal in April 1970. Their research found a "positive correlation . . . between the dose of oestrogen [estrogen] and the risk of . . . cerebral thrombosis." It also noted that estrogen dosage might not be the only factor related to the risk of thromboembolism. Ortho has not claimed that it was unaware of this study, but the report was not cited

---

**6.** *See* Twerski, Weinstein, Donaher & Piehler, *The Use and Abuse of Warnings in Products Liability—Design Defect Litigation Comes of Age*, 61 Cornell L.Rev. 495, 501 (1976) (submitting case to jury on dual grounds of failure to warn and defective design results from realization that if proper warning would result in nonmarketability of product, then the true issue is acceptability of basic design).

**7.** *See* Keeton, *supra* note 3, at 408 (Pasteur vaccine a nondefective product because benefits outweigh serious consequences to few).

**8.** We are aware that in *Ortho Pharmaceutical Corp. v. Chapman*, 388 N.E.2d at 545, the court balanced the public benefits against the attendant risks of oral contraceptives and specifically found "that oral contraceptives come under the protection of Comment k."

**9.** *Reyes* is not a prescription drug case per se because the oral vaccine was not administered as a prescription drug, but by a public health

nurse as part of a mass vaccination program. 498 F.2d at 1276–77. The court found that Wyeth's failure to warn the parents of the child who had received the vaccination was a breach of its duty to warn and rendered the vaccine defective and unreasonably dangerous as marketed. *Id.* at 1277–78.

**10.** The Brochus claim that Ortho's duty to warn attached when the higher risk associated with Ortho-Novum 2 mg. became apparent. Thus we need not consider the interesting issue discussed by other courts whether actual or constructive knowledge of the risk is required in finding a duty to warn. *See Woodill v. Parke Davis & Co.*, 79 Ill.2d 26, 37 Ill.Dec. 304, 402 N.E.2d 194, 197–200, 200–03 (dissenting in part) (Ill.1980); *Ortho Pharmaceutical Corp. v. Chapman*, 388 N.E.2d at 546–48. In such a case, negligence principles may become relevant. We do not see that they are relevant here.

in the package insert [11] for the 2 mg. oral contraceptive or in the package insert for any other Ortho oral contraceptive; in fact, the insert for each of these products was identical.

Ortho argues that its warnings were adequate because they were drafted by the Food and Drug Administration (FDA) as required uniform labeling for all oral contraceptives. It places a great deal of reliance [12] on *Chambers v. G. D. Searle & Co.*, 567 F.2d 269 (4th Cir. 1977) (per curiam), which affirmed a directed verdict for Searle on the opinion of the district court. The plaintiff in *Chambers* sustained her injury in July 1970, but none of her experts appears to have mentioned the April 1970 study that looms so large in this case. Moreover, the district court specifically stated "that approval by the FDA of the language involved is *not necessarily conclusive* on the question of the adequacy of the warnings." *Chambers v. G. D. Searle & Co.*, 441 F.Supp. 377, 383 (D.Md.1975) (emphasis added); *accord, Ortho Pharmaceutical Corp. v. Chapman*, 388 N.E.2d at 554; *see Salmon v. Parke, Davis & Co.*, 520 F.2d 1359, 1362, 1364 (4th Cir. 1975) (applying North Carolina law in reversing summary judgment for defendant; compliance with federal laws and regulations concerning a drug does not in itself absolve manufacturer of liability). The district court in *Chambers* concluded that the warnings in the package insert approved by the FDA in 1968 were sufficient only after deciding that Searle had no information indicating greater dangers or risks other than that available to the FDA drafting group in 1968. 441 F.Supp. at 384.

In contrast to the inadequate evidence that the plaintiff presented in *Chambers*, the Brochus introduced testimony by Dr. Herbert A. Wendel, a pharmacologist, who stated that the 1970 study was "very decisive" and demonstrated that a contraceptive pill with over fifty micrograms of estrogen was associated with a higher risk of thromboembolism. There was also evidence that the British Committee on Safety of Drugs, relying on the data that resulted in the April 1970 report, issued at the end of 1969 an early warning to the British medical community that the risk of thromboembolism was greatest in women taking higher-estrogen oral contraceptives. The Committee stated that it "did not feel that it could delay for months for a detailed analysis of the individual preparations, since during each month several women would die unnecessarily and many would suffer from avoidable hazard." By 1971 virtually no 100 mcg. estrogen oral contraceptives were being sold in Great Britain. Even Ortho's expert, Dr. Melvin Taylor, a former chief of gynecology at a major hospital, agreed that the information contained in the 1970 report was important to the medical community.[13]

The absence of any reference to the 1970 British study, which, unlike the four studies actually referred to in the package insert, would have provided numerical data to the physician on the dose-effect relationship between thromboembolic disease and oral contraceptives, was ground for a jury finding that the warnings were factually inadequate. To this is to be added the fact

11. A package insert is a scientific document about the product it accompanies. It contains information on such topics as contraindications, dosage, and administration and includes citations to articles of importance to the physician on the drug. These inserts are reproduced in the Physician's Desk Reference.

12. We direct the attention of counsel for both parties to First Circuit Rule 14, which specifically states that unpublished opinions of this and other courts are never to be cited in unrelated cases, unless they are in the process of being published. 1st Cir.R. 14. For this reason we are unable to consider the other federal appellate court opinion on which Ortho relies in its argument on this issue.

13. The results of the 1970 study received at least partial corroboration in Ortho's own Adverse Reaction Reports, which showed a higher incidence of cardiovascular complaints (77%) and deaths (84%) in users of Ortho-Novum 2 mg. than its proportion of total sales (64%) would suggest. While these figures may not by themselves establish the relationship, they do undermine Ortho's contention that it had no basis for believing in a dose-effect relationship between oral contraceptives and strokes.

that the inserts for each of Ortho's oral contraceptives were identical, despite this evidence that higher-estrogen-dose pills might present greater risks to users.[14] From this, the jury might have concluded that the warnings for the 2 mg. pills were inadequate. The jury might also have considered on the question of warning the fact that the salesperson who regularly called on Dr. Campbell did not orally inform him that the 2 mg. drug appeared to present a higher risk of thromboembolism. *See Sterling Drug, Inc. v. Yarrow,* 408 F.2d at 992, 993 (trial court may find it unreasonable to fail to instruct sales personnel to warn physicians on whom they call regularly of drug dangers; not clearly erroneous to find such sales personnel present most effective method of warning doctors).

In view of the expert testimony that the April 1970 study did establish the existence of a positive correlation between the dose of estrogen and the risk of cerebral thrombosis, and the admitted fact that the labeling did not refer to this study, Ortho's claim that the Brochus did not provide expert testimony on the inadequacy of the label is untenable.

## C. *Causation*

▮ A plaintiff in a defective design case must prove that the unreasonably dangerous condition existed when the product was purchased and that this condition caused the injury. The plaintiff must also prove that the manufacturer could reasonably foresee the manner in which the product would be used. *Thibault v. Sears, Roebuck & Co.,* 118 N.H. at 809, 395 A.2d at 847. Because the absence of proper warnings itself renders a product unreasonably dangerous, *e. g., Reyes v. Wyeth Laborato-*

ries, 498 F.2d at 1275 (unreasonably dangerous as marketed); *Woodill v. Parke Davis & Co.,* 402 N.E.2d 194, 196, 79 Ill.2d 26, 37 Ill.Dec. 304 (Ill.1980); *Ortho Pharmaceutical Corp. v. Chapman,* 388 N.E.2d at 549, the jury had a basis for finding that the contraceptive was unreasonably dangerous when sold to Mrs. Brochu. There can be no question that Mrs. Brochu was using Ortho's product in a reasonably foreseeable manner.

We next consider whether the failure to warn adequately was a proximate cause of Mrs. Brochu's use of this drug. *See Reyes v. Wyeth Laboratories,* 498 F.2d at 1279 & n.26; *Ortho Pharmaceutical Corp. v. Chapman,* 388 N.E.2d at 555. At trial, the Brochus presented the following testimony from Mrs. Brochu's prescribing physician, Dr. Campbell:

Q. Were you ever told at any time, during the period of 1967 through the date of her stroke, that is November 15, 1971, by representatives of Ortho, that the two-milligram pill was more likely to cause stroke than a lower-dose pill?

A. No.

Q. Did you ever receive directly any suggestions, from representatives of Ortho, either detail men in the field, or in any other way, that it would be a good idea to shift your patients down from a higher-dose pill to a lower-dose pill during this period of '67 through '71?

A. No.

Q. Were you aware, prior to Judy's stroke, from any source that you can remember, that the two milligram pill was a more dangerous or a higher-risk pill than the lower-dose pills?

A. No.

14. Some attention might also be paid to context; the package insert contained several tentative conclusions and nonconclusions that appear to be less factually based than the 1970 study. (*E. g.,* "[T]here might be an increased risk of thromboembolic disease in users of sequential products. This risk cannot be quantitated ...." "[T]he safety of ORTHO–NOVUM 2 mg. in pregnancy has not been demonstrated ...." "The long range effect to the nursing infant cannot be determined at this time.") We

by no means wish to suggest that Ortho would have been better off omitting these as well; we merely point to them as tending to undermine Ortho's contention (countered by plaintiffs' experts) that the asserted methodological problems with the study excused its omission. The standard actually followed for inclusion appears to have been considerably less than medical certainty, and choosey in the wrong direction.

Q. Had the manufacturer suggested, either through literature or through their own personnel, that you should switch patients down to lower dose formulation, what would you have done?

A. I would have switched them.

On the basis of this testimony the jury could have concluded that, if Ortho's warnings had been adequate, Dr. Campbell would have switched Mrs. Brochu to a lower-dose oral contraceptive.

At trial and in its brief Ortho stressed that physicians are trained to prescribe the lowest effective dose. It seems to argue that it had a right to rely on this training to ensure that Ortho-Novum 2 mg. would be prescribed only when it was the lowest effective dose. In effect, Ortho is attempting to use the actions of the physician, the "learned intermediary," as an intervening cause. We stated in *McCue* that a physician's carelessness, even if it takes an unanticipated form, should not relieve a drug manufacturer of liability if the manufacturer's failure to warn adequately may have contributed to that carelessness. *McCue v. Norwich Pharmacal Co.*, 453 F.2d at 1035; *see Sterling Drug, Inc. v. Yarrow*, 408 F.2d at 994 (trial court properly concluded any failure of plaintiff's physician to learn of warnings from source other than drug company did not relieve company of liability); *Sterling Drug, Inc. v. Cornish*, 370 F.2d 82, 85 (8th Cir. 1967) (plaintiff's physicians' claimed negligent failure to keep up with medical literature not intervening proximate cause).

Finally the Brochus had to prove that this oral contraceptive was the cause-in-fact of Mrs. Brochu's stroke. *See Reyes v. Wyeth Laboratories*, 498 F.2d at 1279; *Ortho Pharmaceutical Corp. v. Chapman*, 388 N.E.2d at 555. At trial, Ortho's counsel skillfully attempted to establish that no study had demonstrated a causal connection between the use of oral contraceptives and an increased risk of stroke. As it did in *Chapman*, Ortho argues that liability cannot be based on failure to state what has not been proven to be true. *Ortho Pharmaceutical Corp. v. Chapman*, 388 N.E.2d at 554. We agree with the *Chapman* court that the question of such a causal relationship was properly for the jury to determine. *Id.*

Three of the Brochus' medical experts, Dr. Merwyn Bagan, a Board-certified neurosurgeon, Dr. John H. Altshuler, Board-certified in anatomic and clinical pathology and immunohematology, and Dr. Wendel, testified that the most likely cause of Mrs. Brochu's thrombosis was her ingestion of oral contraceptives. Ortho presented the testimony of Dr. Ebehard F. Mammen, a professor of physiology and pathology, and Dr. Taylor. Dr. Mammen testified that he could not say with reasonable medical certainty that the Ortho-Novum 2 mg. caused Mrs. Brochu's stroke. He further stated that he could not say "with absolute certainty, [that] it was not the cause." Dr. Taylor testified that he did not think Mrs. Brochu's stroke was caused by taking oral contraceptives. The jury was clearly entitled to decide which of the experts it would believe. There was sufficient evidence to support a finding of causation-in-fact.

## THE JURY INSTRUCTIONS ON STRICT LIABILITY

■ Ortho contends that the trial judge improperly intermingled the concepts of strict liability and negligence in his charge to the jury. It claims that this misled the jury to the extent that a new trial is required.

Ortho points specifically to the following passages from the charge:

A manufacturer of a prescription drug is not an insurer with respect to its products, and the fact that a person sustained injury through the use of the product does not, of itself, mean that the manufacturer did anything wrong.

. . . .

. . . The question for you is: Was there adequate warning given which was reasonable under the circumstances of this case?

. . . Now, under the doctrine of liability, one who sells any product in a defective condition, unreasonably dangerous to the user or consumer, is subject to liabili-

ty for physical harm thereby caused to the ultimate user or consumer if the seller is engaged in the business of selling such a product, and it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. The rule just stated applies, although the seller has exercised all possible care in the preparation and sale of his product, and the user or consumer has not bought the product from or entered into any contractual relation with the seller . . . .

Where, however, he has reason to anticipate that danger may result from a particular use as where a drug is sold which was safe only in limited doses, he, meaning the manufacturer, may be required to give adequate warning of the danger, and a product sold without such warning is in a defective condition.

A drug manufacturer has imposed upon him an affirmative duty to warn the medical profession of the dangerous side effects that might result from the long-term use of its product.

. . . .

To satisfy its duty to warn, the defendant drug manufacturer must have utilized a method of warning which was effective, in light of the gravity of the risk of danger of ingesting the product.

. . . .

In determining whether the defendant sold an unreasonably dangerous product for the purposes of contraception, you should consider whether the risk of danger could have been reduced without significant impact on the product's effectiveness.

We must confess that we find the charge considerably less than a model of clarity. We wonder, for example, why the defective design portion appears in the middle of the section on fraud. At the same time we do not agree with Ortho that these instructions allowed the jury to choose the law it preferred to apply. As we have discussed in detail, the Brochus alleged two types of strict liability claims. Under the design-defect theory the jury was properly instructed

that the seller is liable under certain conditions even if it has exercised all possible care in the preparation and sale of its product. One factor for the jury to consider is whether the risk could have been reduced without significantly influencing the product's effectiveness.

Under the duty-to-warn theory, a product sold without adequate warnings is in a defective condition. The duty requires that the physician, not the patient, be warned; it is discharged by an effective warning.

The instruction stating that the manufacturer must warn "of the dangerous side effects that *might* result from the long-term use of its product" does not, as Ortho claims, require that the duty be measured in terms of present medical knowledge rather than what was known at the time Mrs. Brochu suffered her stroke. It is clear from the record that the adequacy of the warning turned on the weight given to the 1970 British study.

Ortho levels especially strong criticism against the jury instruction which states that when a manufacturer "has reason to anticipate that danger may result from a particular use as where a drug is sold which was safe only in limited doses . . . the manufacturer . . . may be required to give adequate warning of the danger." Because no witness specifically testified that Mrs. Brochu would not have suffered a stroke if she had been taking an oral contraceptive with a lower-estrogen dose, Ortho claims that this charge was factually unsupported. We do not think that plaintiffs had to prove a negative. Viewing the evidence in the light most favorable to plaintiffs, *deMars v. Equitable Life Assurance Soc'y of the United States*, 610 F.2d 55, 57 (1st Cir. 1979); *Harrington v. United States*, 504 F.2d 1306, 1312 (1st Cir. 1974), we think there was sufficient evidence to make this a jury question. The British study found a dosage correlation between estrogen and thromboembolism. Mrs. Brochu's prescribing physician testified that if he had known of the study, he would have switched the prescription to one with a lower-estrogen dose. Three well-qualified experts testified that

Mrs. Brochu's stroke was causally related to defendant's drug. Plaintiffs did not have to prove causality to a scientific certainty. All that was required was a reasonable preponderance of the evidence. This test was met.

## FRAUDULENT MISREPRESENTATION

The Brochus advanced a second theory of liability: that Ortho fraudulently misrepresented to the medical profession that the risks for each of its oral contraceptives were the same, when in fact the risk of thrombosis from higher-estrogen oral contraceptives was significantly greater. Ortho argues on appeal that the trial court should have directed a verdict in its favor because there was no evidence to support this theory. Contending that this instruction inflamed the jury, it requests a new trial.

 Under New Hampshire law, a representation is fraudulent if made with knowledge of its falsity or with conscious indifference to its truth, and if the false statement was made for the purpose or with the intention of causing another to act on it. *Hall v. Merrimack Mut. Fire Ins. Co.,* 91 N.H. 6, 10, 13 A.2d 157, 160 (1940). Fraud must be established by clear and convincing proof, not "implied from doubtful circumstances which merely awaken suspicion." *Lampesis v. Comolli,* 101 N.H. 279, 283, 140 A.2d 561, 564 (1958); *accord, Sheris v. Thompson,* 111 N.H. 328, 331–32, 295 A.2d 268, 271 (1971); *Ibey v. Ibey,* 93 N.H. 434, 436, 43 A.2d 157, 158–59 (1945). Proof, however, need not be absolute; it may be founded on circumstances when "the defendant's motive to mislead was strong and his conduct both before and after the misrepresentation complained of

evinced a controlling intent to look after his own interests rather than carry out his commitments to the plaintiff." *Lampesis v. Comolli,* 101 N.H. at 283, 140 A.2d at 564.

The court properly placed this extra burden upon plaintiff in charging on the issue of fraud. This very burden, however, raises a serious question whether the evidence justified a finding of a state of mind more reprehensible than negligent. Under the unusual circumstances of this case, however, we would find no prejudice even if a finding of fraud was unwarranted.

 Ordinarily, to submit two counts for general verdict where the evidence does not justify recovery on both, constitutes error, since it cannot be told that the jurors did not take the wrong route. *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prods. Co.,* 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1136, 8 L.Ed.2d 305 (1962); *Wilmington Star Mining Co., v. Fulton,* 205 U.S. 60, 79, 27 S.Ct. 412, 419, 51 L.Ed. 708 (1907). The case at bar, however, is unusual in that the elements needed for fraud and for strict liability corresponded, except that fraud required an additional element. If the jury erroneously thought this element established, and wrongly concluded that there was fraud, it necessarily—and warrantably—must have found all the elements establishing strict liability. Since the damages were the same in either event, no punitive damages having been claimed, defendant was not harmed. Rather, it was a case where all roads led to Rome.

We do not believe the court's reference in the charge to the possibility of fraud, even assuming it was error, could have seriously prejudiced the defendant. The charge put a heavy burden on the plaintiffs, and we do not find it inflammatory.[15]

15. The trial judge's charge on fraudulent misrepresentation stated:

Relative to the burden of proof in the claim or count of false misrepresentation, fraud and deceit are never to be presumed, but must be established by clear and convincing proof, and cannot be implied from doubtful circumstances which merely awaken suspicion. A greater degree of proof is necessary than the preponderance rule I just gave you

in a civil case, but not as great as reasonable doubt degree of proof in a criminal case.

During the general instructions to you by Judge Devine, I know that he talked about the burden of proof in a criminal case, and that is that each and every element of the crime or offense charged must be proved by proof beyond a reasonable doubt. What I'm telling you, in effect, under the fraudulent count, under clear and convincing evidence,

## DAMAGES

■ Ortho contends that the judge's failure to instruct the jury to discount to present value the Brochus' damages for future losses was reversible error. At the outset it should be noted that Ortho did not object to the absence of such an instruction before the jury retired to consider its verdict. Thus under Federal Rule of Civil Procedure 51 this claim was waived.[16] Ortho is therefore forced to resort to an argument that the trial judge failed to respond properly to a jury question which, it asserts, impliedly raised the question of discounting.

During its deliberations, the jury asked the trial judge, "[r]egarding the amount shown to us by ... [plaintiffs' counsel] during his summation, is this the minimum amount we can award, or can we award a lesser amount, if we decide in favor of the plaintiff?" After determining that the jurors had not yet decided the issue of liability, the judge refused to answer the question and informed them that the issue of liability was the first thing to be decided.

The next day the jury, having found Ortho liable, asked the judge the same question. At the bench conference on this question, the Brochus' attorney argued that certain medical expenses, both past and projected, and lost wages from 1972 through 1979 did in fact constitute a mini-

mum recovery. Ortho's counsel felt the proper answer to the jury query was simply "yes," because:

> I think to go beyond that and start indicating certain things which they must do would be error. It strikes me on the evidence that there has been no dispute over the medical bills, okay? I don't think the jury is obliged to accept anything in the future, nor do I think they are to accept all of the lost wages claimed, nor do I think they are obliged to accept the future lost earning capacity.
>
> Any suggestions to this jury of a minimum amount would be inappropriate, and that the simple answer to the question is "yes."

The judge noted his concern about formulating an answer that would not prejudice either party. He then answered the jury by restating his original damages charge. He asked the jury if there were any other questions and received no response.

On appeal, Ortho characterizes the jury's question as an indirect inquiry as to whether they should discount the award for future damages. We view the question in the same manner as Ortho's counsel, as well as plaintiffs' counsel and the trial judge, viewed it at the time it was asked. Not once during the bench conference did Or-

---

it must be greater than that in a civil case and not as great as that in a criminal case. %y27 . . .

Now, at this time I'm going to charge you relative to fraudulent misrepresentation. But before I do, remember again that the burden of proof is clear and convincing evidence and not a preponderance.

In order to find fraudulent misrepresentation, the jury must believe that the defendant, one, misrepresented a material fact to the plaintiff; two, with a fraudulent intent that the latter act upon it; and three, that the plaintiff honestly believing the misrepresentation, did act upon it to her detriment.

To constitute actionable fraud, representations must be fraudulent, as well as false, and damage must ensue. A fraudulent misrepresentation, in distinction from a negligent one, must have been made either with knowledge of its falsity or with conscious indifference to its truth, and it caused or contributed to cause the injury of which the plaintiff complains.

In determining whether the defendant sold an unreasonably dangerous product for the purposes of contraception, you should consider whether the risk of danger could have been reduced without significant impact on the product's effectiveness. The defendant is guilty of fraudulent misrepresentation and is liable to the plaintiffs for their damages if you find that the defendant made a false misrepresentation of a material fact to Dr. Campbell, knowing it to be false, or having no knowledge or belief as to its truth; and if the defendant suppressed a material fact, if the plaintiff's doctor did not have knowledge of its falsity and relied on it, and if the plaintiff was injured thereby.

16. Federal Rule of Civil Procedure 51 provides in pertinent part that "[n]o party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Fed.R.Civ.P. 51.

**664**

tho's attorneys mention the word "discounting." The discussion was plainly limited to what elements of damages the jury was free to accept. We find no merit in Ortho's claim for a new trial based on the trial judge's handling of the jury question.[17]

*Affirmed.*

Memorandum and Order on Defendant's Motion for Certification to the New Hampshire Supreme Court or, in the Alternative, Petition for Rehearing and Suggestion of Rehearing En Banc

Defendant's motion proceeds on two theories that we find inappropriate. The first is to reargue, with superlatives of surprise, what was prominently a point before, down to the minutiae of stating that we "ignored" a remark of the New Hampshire court that defendant had not even cited, and which we find inapposite in any event. The function of post-decisional motions is not routine reargument, with or without a second guess.

Equally, if defendant believes this issue should be certified to the New Hampshire court, the time to say so is first off, not to wait for a second bite at the apple. If we have misread the New Hampshire law, which we doubt, a second defendant may correct it. So far as this defendant is concerned, it has had its day in court.

Since Chief Judge Coffin has recused himself in this case, and all members of the panel vote against an en banc hearing, a majority of the active judges of the circuit have voted against it (Fed.R.App.P 35 (a)) and said motion is also denied.

**17.** New Hampshire has apparently not examined the issue of discounting in recent years. We note, however, that courts around the nation have not been oblivious to the effects of inflation on damage awards. The Supreme Court of Pennsylvania, following the lead of the Alaska Supreme Court, has adopted the total offset method, which allows the court to presume that future interest rates will equal future inflation. *Kaczkowski v. Bolubasz*, 421 A.2d 1027 (Pa.1980). Similarly, a panel of the Second Circuit has recently suggested the use of an adjusted discount rate of 2% to reflect the effect of inflation on the estimation of lost future wages. *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30 (2d Cir. 1980).