Hillsborough
No. 7826

DAVID W. THIBAULT

v.

SEARS, ROEBUCK & COMPANY

November 30, 1978

*Craig, Wenners, Craig & McDowell*, of Manchester (*Vincent A. Wenners, Jr.*, orally), for the plaintiff.

*Devine, Millimet, Stahl & Branch*, of Manchester (*Shane Devine* orally), for the defendant.

DOUGLAS, J.    This is an action to recover damages for harm sustained by the plaintiff when a lawn mower manufactured by the defendant injured the plaintiff's foot. Trial by jury on tort counts sounding in negligence and strict liability before *Flynn*, J., resulted in verdicts for the defendant. The plaintiff's exceptions concerning his strict liability claim were reserved and transferred. We affirm.

The plaintiff bought a "Craftsman" rotary power mower from the Sears, Roebuck & Company outlet in 1968. He had used similar mowers for over fifteen years and was thoroughly familiar with them. The rear of the housing of plaintiff's mower is embossed with the warning, "Keep Hands & Feet From Under Mower." The instruction booklet twice advises the operator to mow slopes lengthwise, not up and down. Although this advice is not highlighted, the type throughout the booklet is easily readable.

Despite this advice, the plaintiff thought that a long steep slope on his property could be mowed more safely if it were mowed up and down. While mowing in this manner, he lost his balance and fell. He instinctively gripped the handle of the mower as he fell and when he came to rest at the bottom of the slope, his foot was under the housing. Although there was conflicting testimony at the trial, the plaintiff contended that his foot slipped under the housing because the mower lacked a rear trailing guard. The defendant contended that the plaintiff lifted the mower from the ground when he fell, thus bringing the blade down on his foot. The defendant therefore

argued that the lack of a guard did not contribute to the accident. Alternatively, the defendant contended that the plaintiff was "contributorily negligent" in mowing up and down contrary to the explicit written instructions.

Before the adoption of the doctrine of strict liability, the injured consumer's recourse at law was "to bring an action based either on the negligence of the manufacturer or, additionally or alternatively, on breach of warranty." Cassidy, *Strict Liability in New Hampshire*, 18 N.H.B.J. 3, 4 (1976). Consumers may now maintain actions based upon strict liability. *Buttrick v. Lessard*, 110 N.H. 36, 260 A.2d 111 (1969); *Elliott v. Lachance*, 109 N.H. 481, 256 A.2d 153 (1969). Some commentators have suggested that strict liability is in reality a tool of social engineering, and that manufacturers should be required to bear the entire risk and costs of injuries caused by products. "If redistribution [of costs] is desired, there is no reason why the law should retain the requirements of causation and product defect; to the extent that any defendant can rely upon those requirements to defeat a plaintiff's cause of action, this 'policy' of tort law will be defeated." Epstein, *Products Liability: The Search for the Middle Ground*, 56 N.C.L. Rev. 643, 659 (1978).

■ We disagree with this approach to the doctrine of strict liability. Unlike workmen's compensation and no-fault automobile insurance, strict liability is not a no-fault system of compensation. The common-law principle that fault and responsibility are elements of our legal system applicable to corporations and individuals alike will not be undermined or abolished by "spreading" of risk and cost in this State. Viewed as a system of spreading the risk, the doctrine of strict liability has had economic consequences. In the fifteen years since *Greenman v. Yuba Power Products, Inc.*, 59 Cal. 2d 57, 377 P.2d 897, 27 Cal. Rptr. 697 (1963), some writers have noted that the doctrine "has led to a decline in consumer 'freedom of choice.' Consumers willing to assume risk, and who want to avail themselves of lower product prices, are less able to do so." Sachs, *Products Liability: An Economic View*, 14 Trial 48, 51 (1978).

The "Fortune 500" companies suffer less economically because they can develop adequate statistics, purchase insurance, and employ expensive experts and legal counsel. For thousands of small manufacturers, the high cost of self-protection or insurance can be prohibitive so as to force them out of business. *See* Baldwin, *The Product Liability Crisis: Threat to Our Economy, Our Industry,* Woodworking & Furniture Digest (March, 1977). The resultant

economic concentration lessens the consumer's choices in the market-place. While we reaffirm *Buttrick v. Lessard,* 110 N.H. 36, 260 A.2d 111 (1969), we recognize some limits to the doctrine of strict liability. *See Bolduc v. Herbert Schneider Corp.,* 117 N.H. 566, 374 A.2d 1187 (1977).

■ The present case concerns the elements of and defenses to a strict liability action alleging defective *design.* We are not here in-volved with an action alleging a *manufacturing* defect, where the defect is an accidental variation caused by a mistake in the manufac-turing process; that is, where the product does not "conform to the great majority of products manufactured in accordance with that de-sign." Henderson, *Judicial Review of Manufacturer's Conscious Design Choices: The Limits of Adjudication,* 73 Colum. L. Rev. 1531, 1543. *See also Corbin v. Camden Coca-Cola Bottling Co.,* 60 N.J. 425, 431, 290 A.2d 441, 444 (1972). A design defect occurs when the product is manufactured in conformity with the intended design but the de-sign itself poses unreasonable dangers to consumers. Henderson, *supra* at 1543.

■■ In a strict liability case alleging defective design, the plain-tiff must first prove the existence of a "defective condition unreason-ably dangerous to the user." *Buttrick v. Lessard,* 110 N.H. at 38–39, 260 A.2d at 113; *Bellotte v. Zayre Corp.,* 116 N.H. 52, 352 A.2d 723 (1976). In determining unreasonable danger, courts should con-sider factors such as social utility and desirability. Wade, *On the Na-ture of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 837 (1973). The utility of the product must be evaluated from the point of view of the public as a whole, because a finding of liability for de-fective design could result in the removal of an entire product line from the market. Some products are so important that a manufac-turer may avoid liability as a matter of law if he has given proper warnings. *See, e.g., Basko v. Sterling Drug, Inc.,* 416 F.2d 417 (2d Cir. 1969); *Davis v. Wyeth Laboratories, Inc.,* 399 F.2d 121 (9th Cir. 1968). In weighing utility and desirability against danger, courts should also consider whether the risk of danger could have been re-duced without significant impact on product effectiveness and manu-facturing cost. For example, liability may attach if the manufacturer did not take available and reasonable steps to lessen or eliminate the danger of even a significantly useful and desirable product. *See* Twerski, *From Defect to Cause to Comparative Fault—Rethinking Some Product Liability Concepts,* 60 Marquette L. Rev. 297, 316–19 (1977) (discussing risk-utility analysis).

Another factor to be considered is the presence or absence of a warning. Of course, some products, such as carving knives, are obviously and inherently dangerous. When a risk is not apparent, however, the user must be adequately and understandably warned of concealed dangers. We do not agree, however, with such cases as *Davis*, 399 F.2d 121 (9th Cir. 1968), in which the Ninth Circuit held that in the absence of adequate warning a one-in-a-million risk of adverse reaction to a vaccine, known to the manufacturer, was a sufficient basis on which to impose strict liability. We also reject cases that demand that a manufacturer warn against uses which were neither intended by the manufacturer nor within the reasonably foreseeable use of the product. *Cf. Moran v. Faberge, Inc.*, 273 Md. 538, 332 A.2d 11 (Md. 1975) (perfume manufacturer liable for burns to teenage girl whose companion used cologne to scent a lit candle); *Spruill v. Boyle-Midway, Inc.*, 308 F.2d 79 (4th Cir. 1962) (manufacturer in failure-to-warn case liable when child drank furniture polish). These decisions fail to recognize that individual consumers have certain responsibilities. Manufacturers cannot foresee and warn of all absurd and dangerous uses of their product. Such decisions may harm our economy and unnecessarily encourage legislative intervention. *See, e.g.*, An Act Relative to Product Liability Actions, Laws 1978, ch. 31 (creating an "affirmative defense that the risks complained of by the plaintiff were not discoverable using prevailing research and scientific techniques under the state of the art." RSA 507-D:4).

The duty to warn is concomitant with the general duty of the manufacturer, which "is limited to foreseeing the probable results of the normal use of the product or a use that can reasonably be anticipated." *McLaughlin v. Sears, Roebuck & Co.*, 111 N.H. 265, 268, 281 A.2d 587, 588 (1971). Nevertheless, when an unreasonable danger could have been eliminated without excessive cost or loss of product efficiency, liability may attach even though the danger was obvious or there was adequate warning. *See* Montgomery and Owen, *Reflections on the Theory and Administration of Strict Tort Liability for Defective Products*, 27 S.C.L. Rev. 803, 837 (1976); Twerski, *Old Wine in a New Flask—Restructuring Assumption of Risk in the Products Liability Era*, 60 Iowa L. Rev. 1, 14 (1974). A manufacturer "is not obliged to design the safest possible product, or one as safe as others make or a safer product than the one he has designed, so long as the design he has adopted is reasonably safe." *Mitchell v. Ford Motor Co.*, 533 F.2d 19, 20 (1st Cir. 1976) (citations

omitted). The obviousness of the danger should be evaluated against the reasonableness of the steps which the manufacturer must take to reduce the danger. Montgomery and Owen, *supra* at 837; Twerski, *supra* at 14.

██ ██ The plaintiff in a defective design case must also prove causation and foreseeability. He must show that the unreasonably dangerous condition existed when the product was purchased, *McLaughlin v. Sears, Roebuck & Co.*, 111 N.H. at 267, 281 A.2d at 588, and that the dangerous condition caused the injury. W. Prosser, The Law of Torts § 41 (4th ed. 1971). The plaintiff must further prove that the purpose and manner of his use of the product was foreseeable by the manufacturer. This requirement is predicated on the manufacturer's duty to design his product reasonably safely for the uses which he can foresee. Foreseeability of use, however, extends beyond the consumer's actual use of the product; for example, a failure to read or follow instructions for product use may not be fatal to the plaintiff's case if he can show that such failure was reasonably foreseeable. *See generally* Noel, *Defective Products: Abnormal Use, Contributory Negligence, and Assumption of the Risk*, 25 Vand. L. Rev. 93, 97–102 (1972).

██ Inquiry into the dangerousness of a product requires a multifaceted balancing process involving evaluation of many conflicting factors. A court will rarely be able to say as a matter of law that a product has no social utility, or that the purpose or manner of its use that caused the injury was not foreseeable. *See Phillips v. Ogle Aluminum Furniture Inc.*, 106 Cal. App. 2d 650, 235 P.2d 857 (1951); *Haberly v. Reardon Co.*, 319 S.W.2d 859 (Mo. 1958); Noel, *supra* at 96–105. The jury must decide whether the potentiality of harm is open and obvious. *See Messick v. General Motors Corp.*, 460 F.2d 485 (5th Cir. 1972); Montgomery and Owen, S.C.L. Rev. at 830–32. Reasonableness, foreseeability, utility, and similar factors are questions of fact for jury determination. We now turn to defenses.

██ The Restatement (Second) of Torts § 402A, Comment *n* (1965) states in part that:

> [t]he form of contributory negligence which consists in *voluntarily and unreasonably proceeding* to encounter a *known* danger, and commonly passes under the name of *assumption of the risk, is a defense* under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and

nevertheless proceeds to make use of the product and is injured by it, he is barred from recovery. (Emphasis added.)

In *Buttrick v. Lessard*, 110 N.H. at 40, 260 A.2d at 114, this court pointed out that the phrase in comment *n* referring to "assumption of the risk" had led to "some confusion." We saw no difficulty in describing the defense of plaintiff's conduct in voluntarily and unreasonably proceeding to encounter a known danger as one of "contributory negligence" rather than the more commonly known phrase "assumption of the risk." The reason was that this court views "the doctrine of 'assumption of the risk' . . . with distaste. . . ." *Id.; see* Cassidy, *Strict Liability in New Hampshire*, 18 N.H.B.J. 3, 15 (1976). "The problem is largely one of semantics." *Buttrick*, 110 N.H. at 40, 260 A.2d at 114. Of course, product misuse and abnormal uses are defenses to strict liability, *McLaughlin v. Sears, Roebuck & Co.*, 111 N.H. 265, 268, 281 A.2d 587, 588 (1971); *Stephan v. Sears, Roebuck & Co.*, 110 N.H. 248, 266 A.2d 855 (1970).

After the *Buttrick*, *Stephan* and *McLaughlin* causes of action had arisen, the legislature passed a comparative negligence statute effective August 12, 1969. That statute requires a comparison of defendant's negligence with plaintiff's contributory negligence. Thus contributory negligence is no longer an absolute bar to a negligence action; a comparing process is now used by the jury. A plaintiff can recover if the jury does not find that his negligence was greater "than the causal negligence of the defendant." RSA 507:7-a (Supp. 1977) repealing RSA 507:8.

Although this statute had no effect on the causes of action before the court in *Buttrick*, *Stephan*, and *McLaughlin*, comparative negligence has since been assumed to be applicable in strict liability cases in New Hampshire by federal courts. *Stevens v. Kanematsu-Gosho Co. Inc.*, 494 F.2d 367 (1st Cir. 1974); *Cyr v. B. Offen & Co., Inc.*, 501 F.2d 1145 (1st Cir. 1974); *Hagenbuch v. Snap-On Tools Corp.*, 339 F. Supp. 676 (D.N.H. 1972). We now hold, however, that the comparative negligence statute, RSA 507:7-a, does not apply to strict liability cases because it is confined by its terms to actions for negligence. However, strict liability is a judicially created doctrine, to which the principle of comparative causation will be applied as hereinafter described.

We viewed the Restatement distinction between assumption of the risk and contributory negligence as merely "semantics" in *Buttrick v. Lessard supra.* These semantical distinctions, however, become

extremely important when a trial judge attempts to convey concepts to a jury in his charge. The language and connotations of legal terms such as "negligence," when transferred from other types of cases, may lead to jury confusion in strict liability cases.

Other courts have recognized that when fault or negligence concepts are injected into a strict liability case using comparative negligence, semantic and conceptual problems become crucial. In a reversal of some of its earlier "pure" products liability stances, the California Supreme Court attempted to delineate those factors the jury must compare in a strict liability case. In *Daly v. General Motors Corp.*, 20 Cal. 3d 725, 575 P.2d 1162, 144 Cal. Rptr. 380 (1978), a "second collision" action, a single car accident resulted in the decedent being ejected from his car due to what plaintiff alleged was a defectively designed door latch mechanism. The defendant asserted that the decedent had been intoxicated and had failed to use a seat belt or lock on the door (despite warnings in the owner's manual). The California court stated the theoretical question as follows:

> Because plaintiff's case rests upon strict products liability based on improper design of the door latch and because defendants assert a failure in decedent's conduct, namely, his alleged intoxication and nonuse of safety equipment, without which the accident and ensuing death could not have occurred, there is thereby posed the overriding issue in the case, should comparative principles apply in strict products liability actions?

*Id.* at 731–32, 575 P.2d at 1165, 144 Cal. Rptr. at 383.

The court answered in the affirmative and we agree. The California court pointed out that there are semantical and theoretical differences between the "apples" of negligence and the "oranges" of strict liability that should not be mixed. *Id.* at 734, 575 P.2d at 1167, 144 Cal. Rptr. at 385. The court held, however, that it was not balancing dissimilar concepts by using comparative fault in a strict liability case, reasoning that, "[t]he conduct of one party in combination with the product of another, or perhaps the placing of a defective article in the stream of projected and anticipated use, may produce the ultimate injury." *Id.* at 736, 575 P.2d at 1168, 144 Cal. Rptr. at 386.

To the extent the California court included negligence concepts in its comparison, we disagree. Semantic and conceptual clarity is essential if the jury is to understand a defective design case, especially if counts in negligence and strict liability are going to the jury. While we note that both counts are permitted, we do not

recommend to plaintiffs that counts in both negligence and strict liability against the same defendant be submitted to the jury because of the confusion which is created. Where both counts are submitted to the jury, the charge on the negligence count at the present time is:

*Plaintiff's Claim:*   *Defense:*

Negligence   Contributory Negligence

*Governing Statute:*

Comparative Negligence

And on the strict liability count, the jury charge includes:

*Plaintiff's Claim:*   *Defense:*

Strict Liability   Contributory Negligence

*Governing Statute:*

Comparative Negligence

The negligence concept in such instructions to a jury of laymen necessarily pervades the entire charge, thus submerging or obliterating the doctrinal impact of strict liability in a welter of verbiage. The jury should not be expected to grasp the extremely fine distinctions the trial court attempts to provide in its explanation that "comparative negligence" in a strict liability case does not really require a comparison of the parties' "negligence." If the trial courts use the term "plaintiff's misconduct" to replace the words "contributory negligence" in the jury charge, this will separate the theories of strict liability and negligence more effectively in the minds of twelve laymen. "Plaintiff's misconduct" will include, where applicable, product misuse or abnormal use, as well as embodying the "negligence" or "assumption of the risk" concepts in our prior cases of voluntarily and unreasonably proceeding to encounter a known danger. The words "plaintiff's misconduct" accurately describe what action by the plaintiff, combined with the interaction of a defendant's product, caused an accident or injury. In *Buttrick v. Lessard*, 110 N.H. 36, 260 A.2d 111 (1969), we used similar terminology when we said the defendant "would be entitled to have considered [by the jury] the *conduct of the plaintiff* in stepping on the [dimmer] switch with knowledge of the defect and his operation of the car after the lights failed." *Buttrick*, 110 N.H. at 40, 260 A.2d at 113 (emphasis added). Of course, as before, if the jury finds such conduct to have been the sole cause of the accident, the plaintiff is barred from recovery. *See* Restatement (Second) of Torts § 402A, Comment *n* (1965). To state all of the above discussed affirmative defenses to be proven by the defendant as "plaintiff's misconduct" is to use a neutral term

that avoids erroneously injecting assumption of the risk or the "flavor of negligence into the strict liability doctrine." *Hagenbuch v. Snap-On Tools Corp.*, 339 F. Supp. 676, 682 (D.N.H. 1972).

We judicially recognize the comparative concept in strict liability cases parallel to the legislature's recognition of it in the area of negligence. Accordingly, we hold that the trial court should not read RSA 507:7-a (Supp. 1977) in a jury charge on the strict liability count, but rather should instruct the jury that it is to compare the causal effect of the defect in the product or design with the affirmative defense of misconduct of the plaintiff and allocate the loss as hereinafter indicated. The trial court should read or paraphrase Restatement (Second) of Torts § 402A(1) and (2) to the jury; the jury should then usually be asked by special verdict if plaintiff's proof has met the requirements of the Restatement. If plaintiff's proof is sufficient, the jury must weigh the plaintiff's misconduct, if any, and reduce the amount of damages by the percentage that the plaintiff's misconduct contributed to cause his loss or injury so long as it is not greater than fifty percent. If the jury concludes that the "misconduct of the plaintiff" was the sole cause or greater than one-half the cause of the loss or injury, the verdict must be for the defendant. Of course, if plaintiff's misconduct did not cause the loss or injury, there would be no reduction in damages if the defendant is found liable. In multiple defendant cases, if recovery is allowed against more than one defendant, the jury shall apportion the loss in the ratio to which each liable defendant caused or contributed to the loss or injury to the amount of causation or liability attributed to all defendants against whom recovery is allowed. *See Mihoy v. Proulx*, 113 N.H. 698, 700, 313 A.2d 723, 724 (1973). Use of the special verdict is permissible in strict liability cases despite the language of RSA 507:7-a (Supp. 1977) referring to a general verdict in negligence cases. In any complicated or multiple count negligence or strict liability cases, trial judges have the inherent power to use special questions and verdicts to guide the jury and to aid in post-verdict review. *See Daly*, 20 Cal. 3d at 743, 575 P.2d at 1172–73, 144 Cal. Rptr. at 390–91 (special verdict in the maritime doctrine of strict liability for unseaworthiness actions); Epstein, *Products Liability: Defenses Based on Plaintiff's Conduct*, 1968 Utah L. Rev. 267. *But see* Nixon, *The Actual "Legislative Intent" Behind New Hampshire's Comparative Negligence Statute*, 12 N.H.B.J. 17, 25–31 (1969).

To the extent prior cases are inconsistent with the procedure and terminology for the statement of strict liability defenses, they are

overruled. Because comparative negligence has applied in these cases since *Hagenbuch v. Snap-On Tools Corp.*, 339 F. Supp. 676 (D.N.H. 1972), the changes ordered in this case will apply to cases tried thirty days and thereafter from the date of this opinion.

In the present case the jury returned a verdict for the defendant and the trial judge entered judgment. There is evidence to support the verdict. *See Kierstead v. Betley Chevrolet-Buick, Inc.*, 118 N.H. 493, 496, 389 A.2d 429, 431 (1978). Even though the jury could have found that the plaintiff's actual use of the lawn mower that caused the injury was foreseeable, a jury could also have found that the warning was adequate, or that the design was not the cause of the accident, or that the plaintiff's misconduct was more than fifty percent responsible for the injury.

The plaintiff also excepted to the admission of the custom and usage standards of the lawn mower industry. The evidence was relevant and correctly admitted. The trial court charged the jury that the standards were evidence, but not binding on them, and that compliance with the standards would not absolve the manufacturer from liability if those standards did not comport with the jury's notion of proper design. The admission of such evidence under the circumstances was not error. *See Lemery v. O'Shea Dennis, Inc.*, 112 N.H. 199, 200–01, 291 A.2d 616, 617 (1972); Johnson, *Products Liability "Reform": A Hazard to Consumers*, 56 N.C.L. Rev. 677, 687–89 (1978).

*Exceptions overruled.*

LAMPRON, C.J., did not sit; GOODE, J., sat by special assignment pursuant to RSA 490:3; the others concurred.