**Raymond DUFORD and Sandra Duford, Plaintiffs, Appellants,**

v.

**SEARS, ROEBUCK AND COMPANY, et al., Defendants, Appellees.**

**No. 87–1095.**

United States Court of Appeals, First Circuit.

Heard July 30, 1987.

Decided Nov. 25, 1987.

As Amended on Denial of Rehearing Dec. 21, 1987.

Alex Komaridis, Auburn, N.H., for plaintiffs, appellants.

Ovide M. Lamontagne with whom Andrew D. Dunn and Devine, Millimet, Stahl & Branch Professional Ass'n, Manchester, N.H., were on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, BOWNES and TORRUELLA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

We are presented with an appeal from a district court's direction of a verdict in favor of the defendants in a products liability action. We affirm in part and vacate and remand in part.

## I. BACKGROUND

In December of 1979, plaintiffs Raymond and Sandra Duford of Sanbornton, New Hampshire, lost their house and many of their belongings in a fire. It is uncontest-

ed that the fire began in the chimney pipe that ran from the Dufords' wood-burning stove up through the roof. The Dufords contend that the fire was attributable to the defective design of the chimney pipe. Thus, they brought this diversity action against the pipe's seller, Sears, Roebuck & Co., and its manufacturer, Preway, Inc., under the following theories of recovery: 1) strict liability, 2) negligence, 3) breach of implied warranties of merchantability and fitness for a particular purpose, and 4) negligent infliction of emotional distress. As Preway undertook representation for both defendants, we will refer to the defendants collectively as "Preway."

The allegedly defective product is known as a "triple wall pipe." It is part of a woodstove chimney kit that is sold by Sears and manufactured by Preway. The pipe is supposed to be a solution to the problem confronted by people with a woodstove but no built-in chimney: getting the smoke out of the house without igniting the combustible materials adjacent to the chimney apparatus where it sticks through the roof. The triple wall pipe is designed to achieve this end by virtue of its operation on a "heat exchanger basis." Because of its triple wall design (it is basically a pipe within a pipe within a pipe), cold air from outside the house is channeled down around the inner flue pipe, thus lowering the temperature of the chimney pipe's outer walls. The evidence at trial indicated that Raymond Duford inadvertently installed the chimney pipe upside down. Witnesses on both sides agreed that such installation negated the purpose of the triple wall design, and rendered a fire virtually inevitable.

The Dufords alleged in their complaint that the pipe had no markings indicating which end was up. Their primary theory of recovery, therefore, was that Preway was tortiously liable because of its failure to warn of the latent danger of incorrect installation. During discovery, Preway lent credence to this theory by making an admission under Fed.R.Civ.P. 36 that there were no markings on the pipe itself. Preway further endorsed this position by later accepting plaintiffs' pretrial statement that there were no markings on the pipe. So the Dufords were nonplussed when, well into the trial, Preway employee Roy Northwood, who had earlier inspected the pipe and noticed some markings on it,[1] testified that at one end of the pipe, stamped in the metal, were the word "up" and two little arrows. His testimony was confirmed by close examination of the pipe itself, which had been introduced by plaintiffs as an exhibit. The pipe contained embossed markings approximately one-eighth inch high; the markings were not only tiny but also quite faint. Their indistinctness, plus the pipe's sooty condition as a result of the fire, apparently accounted for the fact the markings were overlooked not only by the Dufords and their attorney but also—until Northwood discovered them—by Preway's representatives.

Subsequent to this revelation the plaintiffs proceeded at trial on the theory that the markings, instead of being nonexistent, had been inadequate. This new tack was complicated by the prior testimony of plaintiffs' own expert witness, one Rand, who—testifying before Northwood's disclosure that markings in fact existed—opined that an embossed direction would constitute satisfactory guidance on proper installation of the pipe.[2]

In light of the collapse of plaintiffs' main line of attack, coupled with the self-inflicted wound from their own expert, the district court concluded, following two days of trial, that the Dufords' case was inadequate as a matter of law. The court thus granted defendants' motion for a directed verdict on all counts.

■■■ We would normally be sympathetic to the district court's reaction to this strange case. Courts can hardly be expected to brook the wholesale reconversion of a discredited cause of action in the middle of trial. Yet the unique circumstances here lead us to the conclusion that the Dufords should have been permitted to get to the jury on their revised and their alternative theories of recovery, notwithstanding the disintegration of their chief position.

---

**1.** Northwood apparently first observed the markings during the taking of his deposition several months prior to the trial. There is no indication, however, that he revealed his discovery to the Dufords then. The Dufords' counsel stated at trial that he did not learn of the marks until Northwood testified at the trial itself.

**2.** When Rand testified, plaintiffs had yet to learn that Preway's employee, Northwood, had earlier discovered the existence of markings. As the actual markings were not before Rand, it is not clear from his testimony whether embossed markings of that small size and relative obscurity would have passed muster with him.

First, the size and indistinctness of the markings, and the sooty condition of the pipe, provide a plausible explanation of why the Dufords and their counsel went forward in the good faith belief that there were no markings. Second, Preway, when its representatives were first shown the pipe prior to trial, admitted under Fed.R. Civ.P. 36 that the pipe bore no markings. Whatever Preway's excuse for this initial error, we see no justification for Preway's failure to have moved the court for permission to withdraw or amend this admission. Rule 36 plainly requires such action in a situation such as this, after Preway's employee, Northwood, later discovered the markings before the time of trial. *See Brook Village North Associates v. General Electric Co.*, 686 F.2d 66, 70 (1st Cir. 1982).

To be sure, Preway argues on appeal that it "constructively" withdrew its admission. Its argument is as follows. The admission that the pipe was unmarked was made in tandem with an admission that the pipe was not a Preway pipe. Thus, reasons Preway, it was unreasonable for the Dufords to rely on an admission made by Preway at a time Preway was under the impression it had not manufactured the pipe at issue. Preway contends that when it informally admitted that the pipe was a Preway pipe [3] the Dufords should have stopped relying on *both* earlier Preway admissions. But the Dufords would not necessarily have realized that Preway's change in position as to the manufacturer of the pipe was attributable to someone's finding markings on it. While they were perhaps aware that Preway took the position that all its pipes were marked, it was possible the pipe in question was an exception. Their continued reliance on Preway's "no marking" admission was not unreasonable.

Not only did Preway fail to correct its earlier Rule 36 admission, it made a further misleading statement on the same subject at the time the parties filed pretrial statements. This occurred a month after Roy Northwood, Preway's employee, had observed the markings. The Dufords pretrial statement listed the absence of markings as an "uncontested fact." Preway seem-

ingly accepted this in its own pretrial statement filed shortly afterwards.

In the circumstances, Preway cannot be heard to claim it was prejudiced by the Dufords' change in theories at trial once the markings were discovered, nor should it be allowed to profit from the collapse of the Dufords' main original theory of recovery.

We hold that a verdict for defendants should not have been directed—as appears to have happened—largely because plaintiffs' case on the "no markings" theory self-destructed. We believe that plaintiffs were entitled to have the court treat the *adequacy* of the warnings as having been tried with "the implied consent of the parties." *See* Fed.R.Civ.P. 15(b). Thus, in now reviewing the correctness of directing a verdict, we must inquire whether there was sufficient evidence for plaintiffs to have gone to the jury on an "adequacy" of warning theory. We believe there was, in respect to the strict liability and warranty of merchantability claims. We therefore vacate and remand as to these claims and affirm as to all others.

## II. STRICT LIABILITY AND MERCHANTABILITY

### A. *Strict Liability*

■ We begin with an inquiry into the pertinent substantive law of New Hampshire. The leading New Hampshire products liability case is *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 395 A.2d 843 (1978). In the course of affirming a jury verdict for the manufacturer of an allegedly defectively designed lawnmower, the Supreme Court of New Hampshire expounded at some length on the law of products liability. It endorsed several general principles, which we summarize as follows.[4] *See Thibault*, 118 N.H. at 806–14, 395 A.2d at 845–50.

1) Products liability actions can be brought under either of two theories: defective manufacture and defective design. Under the former, a plaintiff attempts to show a product defect caused by a mistake or accident in the manufacturing process; under the latter, a plaintiff tries to prove that the product's design itself rendered

---

**3.** Preway never moved for permission to withdraw or amend its statement, contained in its Rule 36 admission, that the pipe in question was not a Preway pipe. Apparently, the Dufords' learned of Preway's abandonment of this position through correspondence between the attorneys.

**4.** *Thibault* appears to embrace the general principles of products liability found in section 402A of the *Restatement (Second) of Torts*, although a specific citation thereto appears only in the section of the opinion discussing affirmative defenses.

the product "unreasonably dangerous" to consumers.

2) A court's inquiry into whether a product's design renders it "unreasonably dangerous" is a "multifaceted balancing process involving evaluation of many conflicting factors." *Id.* at 809, 395 A.2d at 847. One factor is the product's "social utility," a consideration that must be weighed against the danger posed by the product. In making this calculation,

> courts should also consider whether the risk of danger could have been reduced without significant impact on product effectiveness and manufacturing cost. For example, liability may attach if the manufacturer did not take the available and reasonable steps to lessen or eliminate the danger of even a significantly useful and desirable product.

*Id.* at 807, 395 A.2d at 847.

3) Another factor in the "unreasonable danger" calculus is whether the product was accompanied by a warning of any latent dangers. (Under this analysis, an inadequate warning constitutes a design "defect.") This "duty to warn," however, extends only to dangers that are reasonably foreseeable: "Manufacturers cannot foresee and warn of all absurd and dangerous uses of their product." *Id.* at 808, 395 A.2d at 847. But a suitable warning is not necessarily a conclusive defense in a defective design case, for liability may still attach if the danger "could have been eliminated without excessive cost or loss of product efficiency." *Id.*

4) The New Hampshire comparative negligence statute applies to products liability actions. Thus, if the jury finds that a plaintiff's proof is sufficient, it must weigh any "plaintiff misconduct," *i.e.*, contributory negligence or assumption of risk, and discount the amount of damages by the percentage of the loss or injury caused by the misconduct. If the plaintiff's misconduct is more than 50 percent responsible, the statute requires a verdict for the defendant.

5) New Hampshire explicitly rejects the outer limits of section 402A liability, namely, liability based solely upon a theory of cost redistribution, *id.* at 806, 395 A.2d at 845, or the theory of liability recognized in cases requiring a manufacturer to warn against even bizarre uses of its product. *Id.* at 808, 395 A.2d at 847.

To sustain the court's direction of a verdict for defendants here, we must determine that the evidence produced at trial, viewed in the light most favorable to plaintiffs, would not have permitted a rational jury to reach any conclusion other than that the defendants were not liable. *See, e.g., Potterton v. Porter,* 810 F.2d 333 (1st Cir.1987). We are unable to make that determination in light of the following evidence.

—Testimony that a triple wall pipe installed upside down would inevitably lead to a fire.

—Testimony that the pipe's manufacturer, Preway, was aware of the danger of upside down installation.

—Testimony by Raymond Duford and his neighbor, who together installed the pipe, that they could not tell, either from the pipe itself or from the installation instructions, which end was up.

—Testimony that there was no structural impediment to incorrect installation of the pipe.

—Testimony that the addition of small "tabs" at one end of the pipe, which would have cost only an estimated tenth of a cent per pipe, would have substantially reduced the likelihood of inadvertent upside down installation.

—The instruction manual, which had no specific warnings about the danger of installing the pipe upside down.

—The indistinct nature of the instructions on the pipe itself. These amounted to faint, embossed arrows and the word "up," each approximately one-eighth inch high, at one end. It was also disputed whether these had been rendered more obscure than they originally were by the fire at the Duford home. While the Dufords' expert conceded that an embossed direction would be adequate, he was not shown this particular marking, hence it is not clear that he endorsed an embossed direction of this relatively small size and this character. In any event, we cannot say, as a matter of law, that these markings were necessarily adequate in the circumstances.

In light of this evidence it would not have been irrational for the jury, properly instructed on the law according to *Thibault,* to have found for the plaintiffs. The jury might have based liability solely on the inadequacy of the warnings, viewing the embossing as too small, the directions for proper installation unclear, or the instruction warnings as too general. Alternatively, or perhaps in conjunction with a belief that the warnings were only margin-

ally sufficient, the jury might have found that an available and reasonable alternative design—to wit, a design incorporating the prophylactic tabs—would have substantially reduced the product's dangerousness.

We underscore our conclusion that the jury *could* have found defendants liable pursuant to the evidence we have described and the reasonable inferences therefrom. We of course do not suggest that it was required to do so, nor do we mean to indicate that any such outcome was preferable. We hold only that the issues were not suitable for disposition by the court, as a matter of law. Much of the testimony at trial was confusing and contradictory, and was provided by a cast of interested witnesses—Raymond Duford, his neighbor, and a representative from defendant Preway. Of course, to the extent the resolution of such a dispute turns on the credibility of witnesses, a jury is the accepted vehicle to make this assessment. *See* C. Wright & A. Miller, *Federal Practice and Procedure* § 2527 (1971). The trial was also thrown off balance by confusion as to the presence of markings on the pipe. While normally plaintiff would have to accept the consequences for this, Preway is also to blame, having not only admitted to their absence but agreed to this in a pretrial statement made *after* its employee had found the markings. Given its misleading concessions, Preway had a duty, which it never discharged, to correct the record upon discovering that markings in fact existed. Had this been done, plaintiff would doubtless have sought to proceed from the beginning on a theory of inadequate warning which, as indicated above, posed a genuine jury issue.

### B. *Implied Warranty of Merchantability*

■ For the same reasons outlined in Part IIA, *supra*, we find that it was error for the district court to have directed a verdict for defendants on the Dufords' claim that Sears breached its warranty of merchantability. The same evidence that would have permitted the jury to find that the chimney pipe was defectively designed under section 402A would also have permitted a conclusion that the pipe was not "fit for the ordinary purposes for which such goods are used," the legal standard under

the warranty of merchantability statute, N.H.Rev.Stat.Ann. 382–A:2–314(2)(c) (1961). The New Hampshire Supreme Court has stated that "when ... any merchant places a defective product in commerce, the plaintiff may plead alternative theories of tort or contract or both." *Sheehan v. New Hampshire Liquor Commission*, 126 N.H. 473, 476, 493 A.2d 494, 496 (1985) (discussing relation between strict liability in tort and implied warranties under the U.C.C.). And the reasoning of the *Thibault* court suggests that either a product unaccompanied by an adequate warning or a product designed without a cheap and available safety device are tantamount to a "defective" product. *Accord, e.g., Campos v. Firestone Tire & Rubber Co.*, 98 N.J. 198, 205, 485 A.2d 305, 309 (1984).

### III. REMAINING CLAIMS

■ The district court correctly directed a verdict for defendants on the Dufords' emotional distress claim. As a threshold matter, we have reservations whether the allegations in the Dufords' complaint stated a claim for which relief is available under New Hampshire law. A natural reading of these allegations suggests that the Dufords' emotional distress was a consequence not of traumatic fear generated by the blaze itself, but was due rather to the social and economic hardship the fire caused them. At several points in the complaint they conclude a catalogue of the property damage caused by the fire with the words, "and [plaintiffs] have suffered great mental distress *as a result of their loss.*" (Emphasis supplied.) There is no specific allegation of emotional distress caused by fear and trauma associated with personal involvement in the fire itself. Thus, the Dufords' reliance on *Chiuchiolo v. New England Wholesale Tailors*, 84 N.H. 329, 150 A. 540 (1930) (allowing recovery for the physical consequences of plaintiff's fright, which was directly caused by defendant's negligence), is misplaced. And we have been apprised of no New Hampshire case that recognizes recovery for emotional distress that was caused by a defendant's negligent interference with plaintiff's property interest.

■ Yet even if the Dufords' allegations are legally sufficient, the district court's

direction of a verdict on this claim was correct. In a pretrial ruling a magistrate had denied the Dufords' motion to amend their pretrial statement to add an expert witness who would testify to the symptoms of Sandy Duford's emotional distress. This ruling was well within the magistrate's discretion: he observed, inter alia, that the expert's services were obtained over five years after the fire and that the plaintiffs' motion was filed ten months after discovery had been completed.

The Dufords were thus unable at trial to adduce evidence, through qualified witnesses, of the physical symptoms of Sandy Duford's alleged emotional distress. We think this failure rendered their claim insufficient as a matter of law. For in *Corso v. Merrill*, 119 N.H. 647, 652, 406 A.2d 300, 304 (1979), the Supreme Court of New Hampshire spoke to this issue: "In other words, the harm for which plaintiff seeks to recover [the physical consequences of emotional distress] must be susceptible to some form of objective medical determination and proved through qualified medical witnesses." We are unpersuaded by the Dufords' argument that *Corso*'s medical proof requirement be limited to the so-called "parental bystander" cases. Not only does *Corso*'s self-proclaimed adoption of a "traditional negligence approach" to these cases belie this position, but the cases *Corso* cites in support of the medical proof requirement are not limited to such cases, *See, e.g., Petition of United States*, 418 F.2d 264, 269 (1st Cir.1969), *cited in Corso*, 119 N.H. at 651, 406 A.2d at 303.

We also affirm the district court's entry of a directed verdict for defendants on the claim of a breach of the implied warranty of fitness for a particular purpose. It is beyond cavil that the Dufords intended to use the chimney pipe for its ordinary purpose—as a chimney pipe—and not for the sort of "particular" or "peculiar" purpose contemplated by the statute that affords this particular protection to the purchasers of goods. *See* N.H.Rev. Stat.Ann. 382–A:2–315 & Uniform Laws Comments (1961).

We vacate and remand the direction of a verdict on the claim against Preway and Sears for strict liability and the claim against Sears for breach of implied warranty of merchantability. We affirm the district court's judgment in respect to all other claims.

*So ordered.*