**Henry FORTIER and Raymond Croteau, Plaintiffs, Appellees,**

v.

**OLIN CORPORATION, Defendant, Appellant.**

**No. 87–1168.**

United States Court of Appeals, First Circuit.

Heard Dec. 9, 1987.

Decided Feb. 18, 1988.

Howard B. Myers with whom David J. Braiterman and Myers, Jordan & Duffy, Concord, N.H., were on brief, for defendant, appellant.

Frank E. Kenison with whom Brown and Nixon, P.C., Manchester, N.H., was on brief, for plaintiffs, appellees.

Before COFFIN, BOWNES and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

This diversity tort action arises out of a hunting accident near Berlin, New Hampshire, on November 2, 1977, involving three teenage cousins, Henry Fortier, Raymond Croteau, and Paul Croteau. Paul was walking behind Henry and Raymond carrying a Winchester Model 94.30 caliber rifle.[1] Paul stumbled and fell. The rifle discharged; the bullet passed through Raymond's left foot and then pierced Henry's right foot where it lodged.

Henry and Raymond brought suit in state court against defendant-appellee Olin Corporation, the manufacturer of the rifle. Olin removed the case to the federal district court.[2] The complaints allege misrepresentations as to the rifle's safety, strict liability based on defective design and failure to adequately warn of the possibility of accidental discharge. The defective design and failure to adequately warn claims can be read as sounding in both strict liability and negligence. The district court held that the defendant was strictly liable for defective design of the rifle's firing pin and for failure to warn of the rifle's dangerous propensities to discharge accidently. *Croteau v. Olin Corporation*, 644 F.Supp. 208, 211–12 (D.N.H.1986). The opinion does not make it entirely clear whether defendant was also being held liable for negligent design and whether the failure to warn finding rested in strict liability or negligence. The proof required for each is,

---

1. This rifle, along with others manufactured at the same time, was designated a "Centennial 66" as a commemorative replica of the original 1866 Winchester. It is referred to in the testimony as "a 94" or a "Centennial."

2. Paul also brought suit against Olin, but took a voluntary nonsuit prior to trial.

however, quite similar. Both appellant and appellees have briefed and argued the appeal as stemming from findings of strict liability based on defective design and negligent failure to warn.

Appellant makes two claims before us: that the court's opinion was insufficient as a matter of law and that the court erred as a matter of law and made clearly erroneous findings of fact in holding defendant liable in strict liability for defective design and in negligence for failure to warn. No appeal has been taken from the assessment of damages. We affirm the finding of strict liability based upon defective design and, therefore, do not reach the failure-to-warn issue.

## I.

We do not find the district court's opinion insufficient as a matter of law. Although not set forth in the detail appellant would prefer, the court's factual findings are clear, unambiguous, and securely anchored in the record. We think part of appellant's dissatisfaction with the district court's opinion is that it reaches a result different than what defendant sought. The court devoted over three pages of its five-page opinion to liability. Appellants suggest that this is too short to do justice to a case of this complexity. After reading over 850 pages of transcript[3] and examining all the exhibits, we do not find this case especially complex or difficult. Part of this is due to the clarity with which the issues were presented. The case was well tried by both sides, although at times counsel spent unnecessary time hacking at the underbrush instead of focusing on the trees. Appellant is particularly exercised because the district court did not specifically rule on or at least directly advert to the lengthy and numerous proposed findings of fact and rulings of law submitted by the parties. Plaintiffs filed 78 requests, defendant filed 220. We have read them all. They cover every conceivable aspect of the case and attest to counsel's grasp of the evidentiary details as well as their ingenuity in being able to wring from the evi-

dence all possible inferences and nuances. Appellant states that the requests were filed "to help guide the judge in evaluating the evidence." Some of them could also be viewed as decoys submitted in an attempt to lure the judge down the path of reversible error. In any event, as appellant acknowledges, a district judge is under no duty to rule on requests submitted by the parties. Under Federal Rule of Civil Procedure 52(a), the court's duty is to "find the facts specially and state separately its conclusions of law thereon." We think that the opinion of the district court complies with the strictures of the rule.

## II.

We first outline the New Hampshire law on strict liability-defective design. New Hampshire has adopted the Restatement (Second) of Torts § 402A theory of products liability:

§ 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The Rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

See *Buttrick v. Lessard,* 110 N.H. 36, 260 A.2d 111, 113 (1969); *Thibault v. Sears, Roebuck & Company,* 118 N.H. 802, 395 A.2d 843, 850 (1978).

---

**3.** The total transcript ran to over 1,100 pages of which about one-fifth pertained to damages.

" 'Strict liability does not make the manufacturer or seller an insurer nor does it impose absolute liability.' " *Elliott v. LaChance*, 109 N.H. 481, 256 A.2d 153, 156 (1969) (quoting *Dippel v. Sciano*, 35 Wis.2d 443, 155 N.W.2d 55, 63 (1967)). " '[S]trict liability is not a no-fault system of compensation.' " *Thibault*, 395 A.2d at 845–46.

A product is defectively designed when it is "manufactured in conformity with the intended design but the design itself poses unreasonable dangers to consumers." *Thibault*, 395 A.2d at 846 (citations omitted). This contrasts with a manufacturing defect, which occurs when the product does not conform to the manufacturer's design.

In *Thibault*, the New Hampshire Supreme Court discussed at length the factors to be examined in determining whether a design is defective. To prove his/her case, "the plaintiff must first prove the existence of a 'defective condition unreasonably dangerous to the user.' " 395 A.2d at 816 (quoting *Buttrick v. Lessard*, 260 A.2d at 113); *Bellotte v. Zayre Corporation*, 116 N.H. 52, 352 A.2d 723 (1976). The court directed that "[i]n determining unreasonable danger, courts should consider factors such as social utility and desirability." *Thibault*, 395 A.2d at 846 (citations omitted). Some products can be so important that, despite the hazards they pose, they might be rendered acceptable if the manufacturer warns of those hazards. *Id.* Thus the presence or absence of a warning may determine whether the product is defective. *Id.* The cost of additional safeguards, as well as their impact on the product's effectiveness, are also factors to be considered. *Id.* The defect and danger must be examined having in mind the manufacturer's general duty, which " 'is limited to foreseeing the probable results of the normal use of the product or a use that can reasonably be anticipated.' " *Thibault*, 395 A.2d at 847 (quoting *McLaughlin v. Sears, Roebuck & Company*, 111 N.H. 265, 281 A.2d 587, 588 (1971)).

In determining the existence of an unreasonably dangerous condition, the court in *Thibault* stated, "[t]he obviousness of the danger should be evaluated against the reasonableness of the steps which the manufacturer must take to reduce the danger." 395 A.2d at 847 (citations omitted). The fact finder must then reach the ultimate conclusion on this issue by evaluating and balancing the many conflicting factors. All the factors—reasonableness, foreseeability, utility of the product, the obviousness of potential harm, and other factors as appropriate—are questions of fact. 395 A.2d at 847–48.

*Thibault* also requires that plaintiff prove causation and foreseeability. 395 A.2d at 847. Causation is proved by showing that the unreasonably dangerous condition existed when the product was purchased. 395 A.2d at 847 (citing *McLaughlin v. Sears, Roebuck & Company*, 281 A.2d at 588). While the *Thibault* court did not further elaborate upon this element, ordinary tort principles of causation apply: the defect must have caused the injury. *See Buttrick v. Lessard*, 260 A.2d at 113 (plaintiff must prove malfunction of automobile lights caused the accident and arose from a defect present at time of purchase). *See also Reid v. Spadone Machine Company*, 119 N.H. 457, 404 A.2d 1094, 1097 (1979) (plaintiff must prove the dangerous condition caused the injury); *Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 659–60 (1st Cir.1981) (applying N.H. law) (proximate cause and cause-in-fact).

We note also that section 402A and the cases refer to the plaintiff as the user or consumer of the product. Defendant did not below or before us argue that the plaintiffs were not users or consumers within the meaning of strict liability. Although New Hampshire has not spoken directly on the issue, it is well-settled that bystanders injured under circumstances similar to the facts of this case may recover from the manufacturer in a strict liability action. W.L. Prosser, *Handbook of the Law of Torts*, at 663 (4th ed. 1971); *Piercefield v. Remington Arms Company, Inc.*, 375 Mich. 85, 133 N.W.2d 129 (1965) (bystander injured by exploding shotgun); *Lamendola v. Mizell*, 115 N.J.Super. 514, 280 A.2d 241, 244 (1971) (plaintiff struck by car manufactured by defendant) (collecting cases).

Product misuse, abnormal use, and a plaintiff's decision to encounter a known risk are all valid defenses in a products liability case and are described under New Hampshire law as "plaintiff's misconduct." *Thibault,* 395 A.2d at 849–50; *Reid,* 404 A.2d at 1098–99. However, where, as here, the defendant seeks to rely upon a nonparty third person's conduct as a defense, "the manufacturer's sole defense is that of total nonliability based upon the third person's conduct as a superseding cause." *Reid,* 404 A.2d at 1099 (citations omitted). The court held that to succeed with this defense, defendant must prove that the negligence or misuse was not reasonably foreseeable. *Id.* Another available defense, not raised by defendant here, is the "state of the art" defense, which is predicated upon the theory that the defendant manufacturer should not be held liable for risks that were "scientifically unknowable" at the time of manufacture, but only for risks then discoverable, which should be measured by the state of the art at the time of distribution or sale. *Heath v. Sears, Roebuck & Company,* 464 A.2d 288, 298–99 (N.H.1983).

### III.

#### A. *How Rifle Fires*

We now turn to the facts. It is necessary to first understand how the firing mechanism in this particular rifle works. As with any rifle, it fires a bullet, a metal projectile which is seated into the front end of a cartridge. The cartridge consists of a metal casing filled with fast-burning powder and a primer at the bottom end. When the primer is struck with sufficient force, it ignites the powder in the cartridge case. As the powder burns, it forms a gas which, as it expands, drives the bullet out of its seat in the end of the cartridge into the barrel of the rifle and towards the target.

The Winchester 94 is loaded by hand; as many as eight cartridges can be pressed into the magazine. If eight cartridges are used, the last one remains in the chamber; it is in a position to be fired.

The integral parts of the firing mechanism are a trigger, a hammer, a bolt, which contains a free floating firing pin, and a locking bolt which contains a firing pin striker. The firing process begins by opening the lever. As the lever is opened, the bolt is retracted and passes backward pushing the hammer into the full cock or firing position. The opening of the lever also causes the locking bolt to be pulled downward so that the striker is not lined up with the firing pin in the bolt. As the lever opens, a cartridge is released by spring tension from the magazine into guides leading it to the chamber. As the lever is closed, the cartridge is forced forward into the chamber, the bolt goes forward so that the free floating firing pin is lined up with the primer on the cartridge, and the locking bolt, which had been depressed, rises behind the bolt locking it in position. The striker in the locking bolt is now lined up directly behind the firing pin in the bolt. The trigger, which is attached to the hammer by a sear, is then pulled. The hammer falls hitting the striker which drives the firing pin into the primer on the cartridge and the bullet is on its way. The lever is operated manually. It must be opened and closed to fire a round or to unload. The trigger has a safety catch which is independent of the lever action.

#### B. *The Proof*

The evidence adduced by plaintiffs can be summarized as follows. Just before the accident Paul Croteau, who was left-handed, was carrying his rifle in what is called the port arms position: the barrel extended across his chest with the muzzle pointing to his right. The lever was partially open, the hammer was at half cock, and there was a live round in the chamber. A half cocked hammer is obtained by first fully cocking it and then releasing it slowly until it is seated in the half cock notch. When the hammer is in half cock, the rifle normally cannot be fired. Half cock thus acts as a safety.

The rifle discharged when it hit the ground. After the accident, a ruptured cartridge was found in the chamber of the rifle and the finger lever was bent. This proves that the discharge was not caused

by squeezing the trigger, either inadvertently or purposely. The rifle discharged when it hit the ground because the bolt was driven forward and the free floating firing pin struck the primer of the cartridge in the chamber. This "inertia" firing was the result of a firing pin that was so heavy as to be dangerous under reasonably foreseeable hunting conditions, *i.e.,* a fall and the rifle being carried with the hammer in the half cocked position with the lever partially opened.

We now turn to a detailed examination of the trial transcript.

*Expert Testimony*

Plaintiffs presented three expert witnesses to explain how and why the rifle discharged. Robert L. Vashaw had worked for over twenty years as a conservation officer in the New Hampshire Fish and Game Department. He is a certified hunting safety instructor with twenty years' experience. At the time of trial, he was chief safety instructor in the Berlin–Milan area and supervised seven other hunting safety instructors. About one hundred students graduated each year from his hunter safety course. The plaintiffs and Paul Croteau took Vashaw's hunter safety course in 1975. Among the subjects covered in the safety courses supervised by Vashaw are muzzle control, hunter ethics, live firing of the firearm and demonstrations of what can happen from misuse of a firearm. The Winchester 94 rifle is used as a teaching weapon in Vashaw's hunter safety courses.

Vashaw was the one who investigated this accident. After he learned of the accident, Vashaw went to the hospital where plaintiffs had been taken and interviewed Paul Croteau. Croteau told Vashaw that he tripped, fell and dropped his rifle which went off wounding his two cousins. Vashaw examined Paul's rifle which was in the back of the pickup truck that had carried the plaintiffs and Paul to the hospital. He noted that the lever was down and bent, that there were scuff marks on the barrel, and that a ruptured cartridge case was still in the rifle. The head of the casing was locked in the extractor and the body was in the chamber. Photographs of the rifle barrel, lever, and the ruptured cartridge casing were admitted in evidence.

The presence of the ruptured cartridge case in the rifle indicated to Vashaw that the bolt and locking bolt were not fully locked in position behind the cartridge case when the rifle fired. If the bolt and locking bolt had been fully locked, all of the energy of the expanding gas from the fast-burning gunpowder would have been expended in driving the bullet out of the forward end of the cartridge case because the cartridge case would have been fully encased in the chamber and could not move backwards. But with the bolt not locked and driven backwards, the cartridge case would be free to expand and rupture due to the pressure of the expanding gas within it.

Vashaw conducted experiments on a Model 94 rifle with the lever partially open and the hammer in half cock, the same mode as the accident rifle was in just before Paul Croteau fell. He found that the rifle would fire if the partially open lever was struck sharply with his hand or a rubber mallet. This firing took place without the trigger or hammer moving. Vashaw demonstrated such a firing in court. He attributed the firing to the inertia of the free floating firing pin which caused the firing pin to go forward and strike the primer of the cartridge case even though the bolt was not fully locked.

It was Vashaw's opinion that the rifle should be considered to be in a safe nonfiring mode if the lever is partially open and the trigger in the half cock position. He had instructed hunters taking his safety course that this was a proper and safe way to carry the rifle. After his investigation of the accident and the experiments he performed, he changed his mind. Vashaw testified that, although the rifle was being carried in what he considered a safe nonfiring mode, it discharged when Paul fell and the lever hit the ground. The discharge, in Vashaw's opinion, was due to inertia firing.

It was Vashaw's opinion that falls by hunters carrying a 94 rifle in the port arms position with the hammer at half cock and the lever partially open is reasonably fore-

seeable. Vashaw further testified that because of the possibility of inertia firing, the 94 rifle was not reasonably safe to be used as a hunting weapon. The reason he gave was that if a hunter slips and falls the weapon can discharge when it is supposed to be in a safe position. Vashaw further testified that after investigating the accident, he did not cite Paul Croteau for violating any safety regulations, that this was a purely accidental discharge, and it was not due to careless handling of the rifle by Paul Croteau.

Plaintiffs' next expert witness was Lama Martin. Martin's principal occupation since 1978 has been testing guns and ammunition and investigating accidents involving guns and ammunition. From 1958 to 1978, Martin had worked for a gun testing laboratory. A complete dossier of Martin's education, training, and experience was admitted in evidence as exhibit 37. Defendant did not challenge Martin's qualifications.

It was Martin's opinion that the rifle discharged because "some impact caused the firing pin to move forward and to fire the primer, and at that time the bolt was closed, fully closed but unlocked." He called this action "inertia firing by the firing pin; ... the rifle stops and the firing pin continues on." Martin emphasized that neither the trigger nor the hammer was involved in the discharge. His explanation for the ruptured cartridge was the same as Vashaw's: the internal pressure of the gas given off by the powder burning inside the cartridge case "blew the base end of the cartridge off and blew the bolt of the rifle open." Martin eliminated the condition of the ammunition as a factor in the discharge, other than that it was present and fired. He explained that the finger lever was bent because it was pressed against the ground and could not move as the bolt was driven backwards.

It was Martin's opinion that the discharge occurred because, as Paul fell, "the muzzle of the rifle, either the end of the barrel or the magazine tube, was rammed into the hard crown [of the dirt road on which Paul was walking] and caused the firing pin to move forward and fire the cartridge with the lever open slightly." Martin conducted tests to determine whether this model rifle would fire if he struck the partially open lever sharply with his hand or a rubber mallet. He found that the rifle would readily fire under these circumstances but also found that closing the lever closed the locking bolt and locked the bolt. This eliminated, in Martin's opinion, the possibility of there being a ruptured cartridge so Martin concluded that slamming the lever shut did not cause this particular discharge. Martin then conducted a series of tests on a 94 rifle in which he dropped the rifle from a height of one or two feet with the lever partially open so that its muzzle struck a large block of wood. These tests caused the rifle to fire and rupture the cartridge case so that it resembled the one taken from the accident rifle. Martin concluded that the rifle would fire even in half cock and the trigger safety on because of firing pin inertia and that the cartridge case will rupture if the rifle is pushed horizontally against an obstruction.

Martin testified further that the heavier the firing pin the more likely inertia firing would occur under these circumstances and the lighter the pin, the less likelihood of inertia firing. He also stated that the 94's firing pin is more massive than those in most other hunting weapons. It was Martin's opinion that the firing pin used in the 94 rifle was three times as heavy as necessary. Martin designed and built a firing pin of lesser mass, put it in a 94 rifle and it worked satisfactorily with three different types of ammunition. The weight of the firing pin in the 94 rifle is 349.6 grains. The weight of Martin's modified pin was 145.00 grains. Both pins were introduced in evidence.

There was testimony by Martin that a spring could easily be added to the 94 rifle that would prevent inertia firing. He estimated that the cost of retooling to make a modified lighter pin would not exceed one dollar per pin. Martin testified that the knowledge and technology necessary to prevent inertia firing in a 94 rifle has been available since 1966. Martin also testified

that in most rifles the firing pin cannot touch the primer of the cartridge unless the bolt is fully closed and locked. But this is not the case with the 94 rifle. There was further testimony by Martin that in 1976 the defendant was testing its 94 model rifles for inertia firing. Exhibits describing such testing by defendant were put in evidence. Martin further testified that in the early 1970's another gun manufacturer, Ruger Company, obtained a patent on a device that prevented inertia firing. Defendant objected to this testimony on the grounds of relevancy. There was testimony that a gun manufacturer, such as defendant, would keep itself current on patents in this field. Since the testimony had some bearing on defendant's knowledge of inertia firing, it was not error to admit it. It was Martin's opinion that the Winchester Model 94 rifle was not a reasonably safe hunting weapon because the free floating firing pin was too heavy and could result in inertia firing when a hunter fell with the rifle in half cock and the lever partially open.

The final expert witness for the plaintiff was Carl Majeski. Majeski had been a member of the Massachusetts State Police for twenty-one years. During part of that time, from 1968 to 1974, he was armory and range officer. Part of his duties were testing, firing, and repairing weapons. One of the weapons he worked with was the Winchester 94 rifle. Prior to joining the State Police, Majeski had served in the Army and graduated from the small arms repair school at Aberdeen Proving Ground. There can be no doubt that Majeski was fully qualified to testify as an expert.

Majeski testified that he first learned about inertia firing by the 94 rifle prior to 1953 when he was in the Army. He made a thorough examination of the accident rifle. He checked the trigger safety and found it to be in proper working order and he found the half cock notch for the hammer to be positive so that it could not be overridden. Based on the tests he conducted, Majeski concluded that accelerated forward motion of the breech bolt assembly and the inertia of the firing pin caused the rifle to fire. In Majeski's opinion, the dis-

charge of the accident rifle was caused by the finger lever being catapaulted upwards, the locking bolt not being fully engaged, and inertia carrying the firing pin into contact with the primer. At the time of ignition, the locking bolt had not fully locked the bolt into position and, as a result, the bolt blew backwards and since the finger lever was "cammed" forward and pressed against the ground it bent. Neither the trigger nor the hammer had anything to do with the discharge.

*Other Evidence*

Plaintiffs introduced evidence of tests in 1974 and 1976 that defendant conducted on its 94 rifle to determine if it would fire when dropped from certain distances above the ground. Although, generally speaking, the results were favorable to the defendant, that is, the percentage of firing was small, the fact that the defendant conducted the tests gives rise to an inference that it knew of the possibility of inertia firing. A letter dated November 4, 1976, from J.P. Jarvis, Director of Arms Engineering for defendant, to Attorney Nicklaus was introduced in evidence. The letter was written in regard to a case in which Nicklaus was defending Olin. The case involved the alleged firing of a 94 rifle while it was being unloaded. The letter states, *inter alia*:

> We have roughly estimated the cost of adding an additional safety to the M/94 and are estimating this cost to be between $1.75 and $2.50 per rifle for manufacturing, and an investment of between $75,000 and $100,000.

> Additionally, Mr. Van Wilgen is conducting "slam fire" tests on Model 94 rifles, and primer sensitivity tests on 30–30 caliber ammunition. The results of these tests will be forwarded to you by Mr. Van Wilgen.

There was evidence that in 1982 defendant's successor, U.S. Repeating Arms, introduced a new bolt to be used in a modified 94 rifle. The bolt has a lighter weight firing pin than the one in the accident rifle. There was evidence that defendant, despite its denial, had a Consumer Product Safety Committee which was aware that there could be an accidental discharge caused by

a hunter falling while carrying a rifle in a position similar to that of Paul Croteau on the day of the accident.

Based on the evidence, we rule that the district court did not err in finding that the defendant was liable in strict liability for using a defectively designed firing pin in its Winchester Model 94 rifle and that the district court did not make any clearly erroneous findings of fact in the course of its decision. There was evidence from which it could be found that the inertia firing of the accident rifle caused the injuries to plaintiffs and that such firing was the direct result of a firing pin that was defectively designed, *i.e.*, it was unnecessarily heavy. There was evidence, and this is not seriously disputed, that the accident rifle, although secondhand, was in essentially the same condition prior to the discharge as when it was manufactured. It could reasonably be concluded from the evidence that the defective design made the rifle unreasonably dangerous for the purpose sold—to be used as a hunting weapon. There was sufficient evidence for a finding that the rifle was not being misused by Paul Croteau at the time of the accident and that, therefore, the cause of the firing was the defective design. *See Reid v. Spadone Machine Company*, 404 A.2d at 1098–99. There was more than sufficient evidence to find that this kind of accident was or should have been foreseeable to defendant. *See Thibault v. Sears, Roebuck & Company*, 395 A.2d at 847.

Defendant put forward a tripartite defense: that it was unsafe to carry the rifle with the lever partially open; that the discharge occurred because the hammer was fully closed, Paul Croteau fell on the rifle and the impact of the lever drove the striker in the locking bolt forward which, in turn, struck the firing pin in the bolt driving it against the primer; and that the firing pin was not defectively designed.

It suffices to say that questions of credibility were for the district court.

*Affirmed.*