Terri **DUDLEY**; Roger **Dudley**

v.

**BUSINESS EXPRESS, INC.;** Concord Commercial Corporation; Marketing Corporation of America; Beech Aircraft Corp.

**Civ. No. 93–581–SD.**

United States District Court, D. New Hampshire.

Oct. 11, 1994.

David S. Osman, Nighswander, Martin & Mitchell, P.A., Laconia, NH, for Terri Dudley, Roger Dudley.

Garry R. Lane, Ransmeier & Spellman, Concord, NH, for Business Express, Inc., Concord Commercial Corp., Marketing Corp. of America.

Ronald L. Snow, Orr & Reno, PA, Concord, NH, for Beech Aircraft Corp.

## ORDER

DEVINE, Senior District Judge.

In this diversity action, plaintiffs Terri and Roger Dudley allege claims of negligence, strict liability, breach of warranty, and loss of consortium against defendants Business Express, Inc., Concord Commercial Corporation (CCC), Marketing Corporation of America (MCA), and Beech Aircraft Corporation (Beech) based on injuries Terri Dudley allegedly sustained when she struck her head while boarding an aircraft manufactured by Beech and operated by Business Express.

Presently before the court are defendants' motions to dismiss plaintiffs' claims for negligence and strict liability on the ground that said claims are expressly preempted by section 1305 of the Airline Deregulation Act of 1978 (ADA), Pub.L. No. 95–504, 92 Stat. 1705, 1708 (codified at 49 U.S.C. App. § 1305(a) (Supp.1994)).[1] Plaintiffs object.

### Background

On September 21, 1991, Terri and Roger Dudley were validly ticketed passengers on Business Express flight # 4526 from Logan Airport in Boston, Massachusetts, to Lebanon Municipal Airport in West Lebanon, New Hampshire. Plaintiffs allege that while embarking upon the Beech Model 1900 aircraft used for said flight, Terri Dudley struck her head on either the top of the door frame or the fuselage and suffered injury as a result. Amended Complaint ¶ 10. In the roughly two years that have elapsed between the injury and the commencement of this action, plaintiffs allege that Terri Dudley has suffered both memory and cognitive prob-

1. The court notes that during the pendency of these motions, Congress passed legislation which renumbered this section of the statute. *See* Revision of Title 49, United States Code, Pub.L. No. 103–272, 108 Stat. 745, 1143 (renumbering the preemption provision from 49 U.S.C. App. § 1305(a) to 49 U.S.C. § 41713(b)). Since the pleadings and motions in this case refer to the prior codification number, the court has chosen to limit any potential confusion caused due the numeral shift by maintaining the prior section number in its preemption discussion.

lems and has incurred substantial medical and hospitalization bills. Plaintiffs further allege that these injuries result directly from defendant Business Express's (1) negligence in maintaining the aircraft in an unsafe condition, (2) negligence in training and hiring its employees, and (3) failure to adequately warn her about the unsafe condition of the aircraft entrance. Roger Dudley, Terri's husband, asserts a claim for loss of consortium.[2]

## Discussion

### 1. Motion to Dismiss Standard

■ When ruling on a motion to dismiss, it is well established that the factual averments contained in the complaint are to be taken as true, and the court should "indulg[e] every reasonable inference helpful to the plaintiff's cause." *Garita Hotel Ltd. Partnership v. Ponce Fed. Bank F.S.B.,* 958 F.2d 15, 17 (1st Cir.1992); *see also Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989). Whether a motion to dismiss will be successful is not dependent upon the likelihood of success on the merits, but rather upon whether the plaintiff is entitled to offer evidence to support his claim. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Thus, a dismissal for failure to state a claim should be granted "only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." *Garita, supra,* 958 F.2d at 17 (quoting *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 52 (1st Cir.1990)).

### 2. Federal Preemption Generally

■ Due to the command of the Supremacy Clause that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding," U.S. Const. art. VI, cl. 2, "[s]tate laws that conflict with federal laws and regulations ... are preempted." *King v. Collagen Corp.,* 983 F.2d 1130, 1133 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 84, 126 L.Ed.2d 52 (1993) (citing, *e.g., Malone v. White Motor Corp.,* 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978)). Courts must look to congressional intent in order to determine what kinds of state laws are within the preemptive sweep of federal law. *Greenwood Trust Co. v. Massachusetts,* 971 F.2d 818, 823 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993). As such, "consideration of issues arising under the Supremacy Clause 'start with the assumption that the historic police powers of the States [are] not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress.'" *Cipollone v. Liggett Group, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947)). The court thus interprets section 105(a)(1) of the ADA mindful of this "presumption against preemption." *Id.,* —— U.S. at ——, 112 S.Ct. at 2618.

### 3. Preemption and the ADA

Although the origin and purpose of the ADA have been diligently set forth many times before,[3] this court has chosen to revisit familiar terrain in light of the absence of any guidance on the instant issue from the First Circuit.[4]

---

2. Terri Dudley and Roger Dudley filed this action on October 8, 1993, in the Superior Court of Grafton County, New Hampshire, alleging negligence and loss of consortium against Business Express. On November 10, 1993, Business Express removed the action to this court on the basis of diversity jurisdiction. 28 U.S.C. § 1332. On March 2, 1994, plaintiffs amended their complaint to include Beech, CCC, and MCA as defendants and to add further allegations.

3. *See, e.g., Hodges v. Delta Air Lines, Inc.,* 4 F.3d 350, 353 (5th Cir.1993), *petition for reh'g en banc granted,* 12 F.3d 426 (5th Cir.1994); *Sedigh v.*

*Delta Airlines, Inc.,* 850 F.Supp. 197, 199 (E.D.N.Y.1994); *Stagl v. Delta Air Lines, Inc.,* 849 F.Supp. 179, 181 (E.D.N.Y.1994); *Margolis v. United Airlines, Inc.,* 811 F.Supp. 318, 320 (E.D.Mich.1993); *Jamerson v. Atlantic Southeast Airlines,* 860 F.Supp. 821, 823–24 (M.D.Ala. 1994).

4. Although there are two cases from within this Circuit which discuss ADA preemption, such cases are inapposite to resolution of the issue presently under consideration since they do not involve claims of negligence or strict liability. *Compare Doricent v. American Airlines, Inc.,* No.

In 1938 Congress, facing a nascent airline industry, passed legislation which created the Civil Aeronautics Board (CAB).[5] The CAB was authorized to "regulate entry into the interstate airline industry, the routes that airlines could fly, and the fares that they could charge consumers." *Morales, supra* note 5, at 421, 112 S.Ct. at 2056 (Stevens, J., dissenting). This 1938 Act also included a "savings clause," which read, "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 49 U.S.C. App. § 1506 (1976).

▮ Although the 1938 Act was replaced by a similar regulatory scheme in 1958,[6] the principal provisions of the statute remained in effect until 1978. In that year, Congress decided to withdraw economic regulation of interstate airline rates, routes, and services, and therefore enacted the Airline Deregulation Act of 1978 "to encourage, develop, and attain an air transportation system which relies on competitive market forces to determine the quality, variety and price of air services." H.R.Conf.Rep. No. 95–1779, 95th Cong., 2d Sess. 53 (1978), *reprinted in* 1978 U.S.C.C.A.N. 3737, 3773. In order to avoid the frustration of that goal by the substitution of state regulations for the recently removed federal regulations, Congress enacted section 105(a) of the ADA. 49 U.S.C. App. § 1305(a). While so doing, Congress also retained the savings clause that preserved common law and statutory remedies. 49 U.S.C. App. § 1506 (1976).

Section 105(a)(1) of the ADA provides:

no State or political subdivision thereof and no interstate agency or other political agency of two or more States shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier....

49 U.S.C. App. § 1305(a)(1) (Supp.1994). In pursuing its mandate, the CAB interpreted section 105 in light of its two underlying policies—to prevent state economic regulation from frustrating the benefits of federal deregulation, and to clarify the confusion under the prior law which permitted some dual state and federal regulation of the rates and routes of the same carrier. 44 Fed.Reg. 9948–49 (1979).

Since "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer," the CAB's regulations interpreting section 105(a) "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). According to the CAB,

Section 105 forbids state regulation of a federally authorized carrier's routes, rates, or services. Clearly, states may not interfere with a federal carrier's decision on how much to charge or which markets to serve.... Similarly, a state may not interfere with the services that carriers offer in exchange for their rates and fares. For example, liquidated damages for bumping (denial of boarding),[7] segregation of smok-

91–12084Y, 1993 WL 437670 (D.Mass. Oct. 19, 1993) (claims of intentional infliction of emotional distress, racial discrimination, and assault and battery not preempted since such claims "have nothing whatsoever to do with any legitimate or quasi-legitimate industry-wide practice of affording airline service") *with Cannava v. USAIR, Inc.*, No. 91–30003–F, 1993 WL 565341 (D.Mass. Jan. 7, 1993) (claims of intentional infliction of emotional distress, breach of contract, and unfair and deceptive acts preempted since such claims "do not present the 'borderline question' of a claim that is only tangentially related to airline services").

**5.** This short history of airlines regulatory legislation is drawn primarily from Justice Stevens'

dissent in *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 418, 112 S.Ct. 2031, 2054, 119 L.Ed.2d 157 (1992).

**6.** Federal Aviation Act of 1958, Pub.L. 85–726, 72 Stat. 731.

**7.** Terms and phrases such as "boarding," "boarding practices," and "boarding procedures" appear throughout the § 1305(a)(1) cases. Although defendant Beech suggests a common usage interpretation, the case law evinces that "boarding," and its permutations, is more properly understood as a term of art. *See, e.g., West v. Northwest Airlines, Inc.*, 995 F.2d 148 (9th Cir.1993) ("boarding practices" refers to procedures such as overbooking and "bumping," not

ing passengers, minimum liability for loss, damages, and delayed baggage, and ancillary charges for headsets, alcoholic beverages, entertainment, and excess baggage would clearly be "service" regulation within the meaning of section 105.

44 Fed.Reg. at 9950–51. Thus, the CAB's own statements in implementing the ADA strongly indicate that the ADA was concerned solely with deregulating economic, not safety, issues.

■ Defendants argue that plaintiffs' state law claims are expressly preempted by section 105(a)(1) of the ADA. Whenever Congress includes an express preemption clause in a statute, reviewing courts are to focus upon the preemptive reach of such provision. *See Morales, supra,* 504 U.S. at 384, 112 S.Ct. at 2037; *Cipollone, supra,* —— U.S. at ——, 112 S.Ct. at 2617 (plurality opinion); *id.* at ——, 112 S.Ct. at 2625 (Blackmun, J., concurring in part and dissenting in part).

In *Morales v. Trans World Airlines, supra,* the Supreme Court considered the preemptive scope of 49 U.S.C. App. § 1305(a). At issue in *Morales* was whether the attorneys general of several states could use state consumer protection statutes to regulate airline fare advertisements or whether such activity was barred by section 1305(a)(1). The Court held that the plain meaning of the term "relating to" in section 1305 evinced a congressional intent to make the scope of preemption broad. *Morales, supra,* 504 U.S. at 384, 112 S.Ct. at 2037. Congress, according to the Court, had determined that " 'maximum reliance on competitive market forces' " would best insure efficiency, innovation, and quality of air transportation services. Deregulation was the key to accomplishing this objective. *Id.* at 378, 112 S.Ct. at 2034 (quoting 49 U.S.C. App. §§ 1302(a)(4), 1302(a)(9)). The preemption clause, therefore, was inserted in order to ensure that the states would not reregulate where Congress had deregulated. State

statutes or actions which have some "connection with or reference to" airline rates, routes, or services are preempted by section 1305(a)(1), even if not specifically applicable to rates, routes, or services. *Id.* at 384, 386, 112 S.Ct. at 2037–38.

The Court further concluded that the primary operating principle of the preemption provision was economic—any state law or statute having a "significant effect" on airline rates, routes, or services is forbidden. By virtue of the "significant impact" analysis, the Court has delimited the scope of "relating to," thereby restricting its sweep to only those classes of cases which have some quantifiable effect on the rates, routes, and services of the airline industry as a whole. If the state law or statute affects airline rates, routes, or services in " 'too tenuous, remote, or peripheral a manner,' " the preemption provision of section 1305 would not operate as a bar. *Id.* (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 100 n. 21, 103 S.Ct. 2890, 2901 n. 21, 77 L.Ed.2d 490 (1983)). Moreover, the Court expressly left open the question of where the preemption line should be drawn in a "borderline" fact situation. *Morales, supra,* 504 U.S. at 390, 112 S.Ct. at 2040.

That the position of the *Morales* court necessitates a broad interpretation regarding the scope of state laws that "relate to" services is beyond legitimate question. This is not to say, however, that the same expansive viewpoint is to be employed in determining the nature of the "services" preempted by section 1305(a)(1). Plaintiffs contend that "services" is to be construed narrowly so as to pertain only to those cases where the services were provided to passengers directly by airline employees. Defendants, on the other hand, argue for an expansion of the "services" scope to a point just shy of the "borderline situation" alluded to in the *Morales* decision.

actually embarking on aircraft); *id.* at 153 (Brunetti, J., concurring in part and dissenting in part) ("An airline's boarding practices certainly come within the ambit of the 'airline services' which it provides to its customers.... [Indeed,] one strains to conceive of an action which could relate to those services more directly than a

lawsuit seeking damages *for the inevitable result of those boarding practices—a passenger getting 'bumped.' "*) (emphasis added); *Stewart v. American Airlines, Inc.,* 776 F.Supp. 1194 (S.D.Tex. 1991) (airline service of "boarding" pertains to question of whether to board passenger or not, not actual event).

The court in *Stagl v. Delta Air Lines, Inc.,* 849 F.Supp. 179 (E.D.N.Y.1994), summarized the case law interpreting the scope of "services" as follows:

> There exist two diverging lines of cases interpreting the breadth of airline "services" encompassed by Section 1305. As noted by the court in *Stewart v. American Airlines, Inc.,* 776 F.Supp. 1194, 1197 (S.D.Tex.1991), "those cases which have held that a [p]laintiff's claims were ... related to 'services' and therefore pre-empted ... all involved *services provided by individual airline employees directly to passengers,* such as ticketing, boarding, in-flight service, and the like." (Emphasis added.) Moreover, these cases generally concern implementation of airline "policies," such as those relating to "bumping, denial of boarding, segregation of smoking passengers," or discrimination, *Margolis v. United Airlines, Inc.,* 811 F.Supp. 318, 322 (E.D.Mich.1993), and typically implicate "elements of the air carrier service bargain." *Hodges,* 4 F.3d at 354.
>
> In contrast stand those cases in which plaintiffs invoke traditional elements of tort law, suing for personal injuries sustained in airport terminals, during flights, or at the hands of airline employees or fellow passengers. Where the pre-emption issue arises in the context of such actions, the courts "almost uniformly [have] resolved *against* federal preemption." *Margolis,* 811 F.Supp. at 322 (emphasis added). These courts apparently reason that the term "airline services" as employed in Section 1305 "does not include or contemplate as a 'service' the duty to exercise ordinary care." *Butcher v. City of Houston,* 813 F.Supp. 515, 518 (S.D.Tex.1993).

*Stagl, supra,* 849 F.Supp. at 181–82.

At bottom, defendants' argument rests on the assumption that the scope of "services" envelops safety. However, "the definition of services that is most plausible in light of the ADA's purpose and historical regulatory antecedents [is that] 'services' is not coextensive with airline 'safety.'" *Hodges v. Delta Airlines, Inc.,* 4 F.3d 350, 354 (5th Cir.1993), *reh'g en banc granted,* 12 F.3d 426 (5th Cir. 1994);[8] *see also Fenn v. American Airlines,* 839 F.Supp. 1218, 1223 n. 11 (S.D.Miss.1993) ("this court seriously doubts the correctness of an analysis which essentially equates 'safety' with 'services'"); *Harrell v. Champlain Enterprises, Inc.,* 200 A.D.2d 290, 613 N.Y.S.2d 1002, 1004 (1994) (noting the court's agreement with the "great majority of the Federal courts ... [that] the traditional role of State law is to be maintained in adjudicating bodily injury claims" under the ADA).

■ Defendants have not informed this court of any reference equating "services" with "safety" in either the actual statutory language or in the ADA's legislative history. This court's own research indicates that since Congress omitted "safety" from the language of section 1305, personal injury actions premised on state law which seek compensation for an airline's alleged negligence fall outside the sweep of the preemption provision of section 1305. *O'Hern v. Delta Airlines, Inc.,* 838 F.Supp. 1264, 1267 (N.D.Ill.1993). *See also, Margolis, supra,* 811 F.Supp. at 324–25 ("Because Congress has not provided any remedy for an airline passenger who suffers personal injury due to the negligence of the airline and its employees, preemption should not apply to a claim under common law negligence to recover for personal injury"); *Jamerson, supra* note 3, 860 F.Supp. at 826 (finding *Margolis* to be well reasoned, the court held that "§ 1305(a)(1) does not preempt state law personal injury claims for negligence against airlines"). Such state actions simply "'affect [airline services] in too tenuous, remote, or peripheral a manner' to have pre-emptive effect." *Morales, supra,* 504

---

**8.** Defendants cite a string of Fifth Circuit cases, including *Hodges,* its companion case, *Smith v. America West Airlines, Inc.,* 4 F.3d 356 (5th Cir. 1993), and a previous unpublished decision, *Baugh v. Trans World Airlines, Inc.,* 915 F.2d 693 (5th Cir.1990), as support for their preemption argument. Such reliance is misplaced. As the *Hodges* court noted, *Baugh* has operated to hamstring the court into a finding of preemption, much to its dismay. *See Hodges, supra,* 4 F.3d at 352 ("The panel believes this is the wrong result and urges *en banc* review."); *Smith, supra,* 4 F.3d at 358. At the behest of the *Hodges* panel, *en banc* review has been granted, so the full Circuit may address the apparent anomaly between their reasoning (no preemption) and their outcome (preemption) in state law tort actions. *Hodges, supra,* 12 F.3d at 426.

U.S. at 390, 112 S.Ct. at 2040 (quoting *Shaw v. Delta, supra,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21).

Particularly instructive is the way the *Margolis* court framed the issue:

Given the Supreme Court's directive that courts determine the preemptive intent of Congress based upon the plain language of the statute, this Court can only conclude that Congress did not intend to preempt state common law actions for personal injury based on the negligence of the airline or its employees. Preemption under section 1305 was not intended to be an insurance policy for air carriers against their own negligence.

*Margolis, supra,* 811 F.Supp. at 323–24 (footnote omitted). Indeed, preemption in this instance "would have the perverse effect of immunizing the airlines—uniquely among virtually all others industries—from the consequences of their own negligence." *Kay v. USAIR, Inc.,* No. 93–4856, 1994 WL 406548 at *3 (E.D.Pa. July 28, 1994).

The ADA amendments to the FAA simply evince no intent, either express or implied, on the part of Congress to preempt traditional state law claims for negligence. Rather, plaintiffs' claims are in fact consistent with the regulations promulgated under the FAA which seek to protect those who fly in airplanes. *Sunbird Air Services, Inc. v. Beech Aircraft Corp.,* 789 F.Supp. 360 (D.Kan.1992) (citation omitted). In fact,

[t]his goal would be enhanced rather than defeated by allowing a jury to consider whether the design of an aircraft is defective, despite the fact that the FAA has already issued a type certificate for the aircraft. *See Fisher v. Bell Helicopter Company,* 403 F.Supp. 1165, 1172 ([D.]D.C.1975) (FAA regulations "must be reinforced and strengthened by courts

called on to develop rules of liability and damages" where "high standards consistent with the regulatory scheme have not been maintained with resulting injury to persons and property."); *Elsworth [v. Beech Aircraft Corp.],* 37 Cal.3d 540, 208 Cal.Rptr. 874, 880, 691 P.2d [630,] 636–37 [1984].

*Id.* at 363. The Tenth Circuit recently echoed this conclusion when it observed that "[t]here is nothing inconsistent with Congress's goal of maximum safety and common law claims." *Cleveland v. Piper Aircraft Corp.,* 985 F.2d 1438, 1443 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993). Further, by its inclusion of the savings clause (section 1506),[9] Congress "has intended to allow state common law to stand side by side with the system of federal regulations it has developed." *Id.* at 1444. Thus, even a broad reading of the phrase "relating to rates, routes, or services" fails to encompass the safety issues raised in plaintiffs' complaint. *See id.; see also* *O'Hern, supra,* 838 F.Supp. at 1267–68; *Public Health Trust v. Lake Aircraft, Inc.,* 992 F.2d 291, 295 (11th Cir.1993).

After consideration of the legislative history and all relevant case law pertaining to section 1305(a)(1) and the scope of "services," it is clear to this court that the great weight of authority holds that state common law claims "based on negligence and the standard of reasonable care [do] not purport to regulate the services that air carriers provide to their customers in exchange for their fares." *Margolis, supra,* 811 F.Supp. at 321; *see also Sedigh, supra,* 850 F.Supp. at 200 (reaching a similar result, the court noted that the "proper focus should be on whether or not the specific common law action addresses matters about which the airlines wish or are likely to compete"); *Hodges, supra,* 4 F.3d at 355 ("state tort laws concerning safe-

---

9. To be sure, the extent of section 1506's saving power has been markedly reduced by the preemptive reach of section 1305(a)(1). Employing a commonplace canon of statutory construction that the specific governs the general, the Supreme Court " '[did] not believe Congress intended to undermine this carefully drawn statute through a general saving clause.' " *Morales, supra,* 504 U.S. at 384, 112 S.Ct. at 2037 (quoting *International Paper Co. v. Ouellette,* 479 U.S. 481,

494, 107 S.Ct. 805, 812, 93 L.Ed.2d 883 (1987)). However, it would be inappropriate to assume that Congress intended the preemption clause to completely subsume the savings clause, especially in the area of traditional state law claims for negligence. *See Margolis, supra,* 811 F.Supp. at 323–24 (noting how Department of Transportation regulations mandate airlines to maintain bodily injury insurance).

ty can be enforced consistently with and distinctly from the services that Congress deregulated").

■ The court finds that the allowance of a state law remedy in this situation will neither create an irreconcilable conflict between federal and state regulations[10] nor frustrate the objectives of either the FAA or the ADA. Defendants' motions to dismiss plaintiffs' state law claims as preempted by section 105 of the ADA are therefore denied.

### 4. The "Failure to Guard" Claim

In their amended complaint, plaintiffs allege multiple strict liability theories against defendants, including strict products liability (Count III), strict liability based on a failure to guard (Count IV), and strict liability based on a failure to warn (Count V). Defendant Beech moves to dismiss Count IV as duplicative of Count III since "[t]he 'failure to guard' claim by plaintiffs does not state a separate theory in strict liability; it is merely an element of the design defect claim advanced by plaintiffs...." Beech Motion to Dismiss ¶ 15. Although the court is well aware of "the confusion that has been generated by the doctrine of strict products liability," *Chellman v. Saab–Scania AB*, 138 N.H. 73, 77, 637 A.2d 148, 150 (1993); *Buttrick v. Arthur Lessard & Sons*, 110 N.H. 36, 37–38, 260 A.2d 111, 112 (1969), and understands the difficulties presented by the strict products liability morass, the court nonetheless finds that dismissal of plaintiffs' failure to guard claim is inappropriate at this stage of the proceedings.[11]

■ An allegation of a defect associated with a product forms the basis of any claim involving products liability. *Gianitsis v. American Brands, Inc.*, 685 F.Supp. 853, 856 (D.N.H.1988); RESTATEMENT (SECOND) OF TORTS § 402A (1965). Count III of plaintiffs' complaint alleges strict liability due to a design defect, which is a defect that "occurs when the product is manufactured in conformity with the intended design but the design itself poses unreasonable dangers to consumers." *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 807, 395 A.2d 843, 846 (1978). In order to sustain a products liability claim based on defective design, plaintiffs must prove:

> (1) that the design of the product created a defective condition unreasonably dangerous to the user; (2) that the condition existed when the product was sold by a seller in the business of selling such products; (3) that the use of the product was reasonably foreseeable by the manufacturer; and (4) that the condition caused injury to the user or the user's property.

*Chellman, supra*, 138 N.H. at 77, 637 A.2d at 150.

Whether a product is unreasonably dangerous requires an analysis "evaluating many possible factors including a product's social utility balanced against the risk of danger, the cost and practicality of reducing the risk of danger, and the presence or absence and efficacy of a warning of hidden danger." *Chellman, supra*, 138 N.H. at 78, 637 A.2d at 150; *Thibault, supra*, 118 N.H. at 807–08, 395 A.2d at 846.

---

10. This is not to say that the FAA does not extensively regulate the operation and maintenance of aircraft as well as the training of airline employees; it does. However, state law regarding negligence does not attempt to impose a different standard of care from that set out in the FAA and corresponding regulations. None of the federal regulations concern the breach of the duty of reasonable care. *See, e.g.*, 14 C.F.R. § 121.123 (facilities must be available for service and maintenance of aircraft); § 121.285 (carriage of cargo in passenger compartment); § 121.421 (flight attendant training); § 121.571 (oral briefing of passengers regarding location of emergency exits, use of seat belts, etc.); § 121.589 (carry-on baggage must be properly stowed and secure before take-off).

11. The court notes that the proper course for Beech to have followed here would have been to move to strike the allegedly duplicative allegations contained in the complaint prior to filing their response to the pleading per Rule 12(f), Fed.R.Civ.P. *See* 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1356 (1990) (Rule 12(f) proper vehicle to eliminate or strike improper or redundant matter from complaint). However, since such motions are also viewed with disfavor by the courts, *see, e.g., id.* at § 1380; *Tonka Corp. v. Rose Art Indus., Inc.*, 836 F.Supp. 200, 217 (D.N.J.1993), the analysis and result obtained would largely parallel what follows.

As the New Hampshire Supreme Court noted long ago,

> A party may rightfully state ... as many facts as constituting part of his cause of action as he supposes may in any event be useful to him, and upon the trial he may prove as many of them as he is able; and he may well recover if he proves one good cause, though he fail as to the others.

*Littleton v. Richardson*, 34 N.H. 179, 190 (1856). More recently, and certainly more concisely, that court indicated that "[p]leadings must inform the defendants with reasonable clarity of the claims brought against them." *Chellman, supra*, 138 N.H. at 78, 637 A.2d at 151 (citing *Brann v. Exeter Clinic*, 127 N.H. 155, 159–60, 498 A.2d 334, 337 (1985)).

■ The court finds that it is neither illogical nor inconsistent to base a strict liability claim on both design defect and alternative theories such as failure to warn or failure to guard. *See, e.g., Brochu v. Ortho Pharmaceutical Corp.*, 642 F.2d 652, 657 (1st Cir.1981) (alleging claims of design defect and inadequate warning not inconsistent); *Villalobos v. Heidelberger Druckmaschien Artiengesellschaft*, 859 F.Supp. 1355, 1358–59 (D.Colo.1994) (failure to guard constitutes a design defect); *Anderson v. M.W. Kellogg Co.*, 766 P.2d 637, 643 (Colo.1988) (product may be defective on a theory of either failure to warn or failure to guard).

■ Since a strict products liability theory has its own required proofs and the design defect claims of failure to guard and failure to warn each require additional proofs, plaintiffs are correct in pleading each theory as a separate count. Consequently, Beech's motion to dismiss the failure to guard claim (Count IV) as duplicative of the strict products liability claim (Count III) must be and is herewith denied.

### 5. The Strict Liability and Implied Warranty Claims

#### A. Business Express

Business Express moves for dismissal of the strict liability and breach of implied warranty claims because such claims are inapplicable to one "whose business is to provide transportation services to commercial passengers." Defendants' Memorandum of Law in Support of Motion to Dismiss at 15. Plaintiffs submit that any decision by this court should be deferred until interrogatories propounded concurrent with their objection to the motion to dismiss have been completed or that defendants' motion should be converted into one for summary judgment.

■ New Hampshire has long ago adopted the doctrine of strict products liability as stated in section 402A of the Second Restatement of Torts. *Buttrick, supra*, 110 N.H. at 38, 260 A.2d at 113. Section 402A reads in relevant part:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such product....

RESTATEMENT (SECOND) OF TORTS § 402A (1965). Strict liability, however, is "not a no-fault system of compensation." *Thibault, supra*, 118 N.H. at 806, 395 A.2d at 845–46. The New Hampshire Supreme Court, "recogniz[ing] some limits to the doctrine of strict liability," *id.* at 807, 395 A.2d at 846 (citations omitted), "has been extremely reluctant to expand the doctrine of strict products liability beyond traditional bounds." *Croteau v. Olin Corp.*, 704 F.Supp. 318, 319 (D.N.H. 1989) (citations omitted); *see also Public Service Co. of N.H. v. Westinghouse Electric Corp.*, 685 F.Supp. 1281, 1285 (D.N.H.1988); *Bagley v. Controlled Environment Corp.*, 127 N.H. 556, 558–59, 503 A.2d 823, 825 (1986); *Siciliano v. Capitol City Shows, Inc.*, 124 N.H. 719, 730, 475 A.2d 19, 25 (1984).

■ The Restatement provision is quite clear that as a prerequisite to liability, a defendant must qualify as a seller of products. *See* RESTATEMENT (SECOND) OF TORTS § 402A cmt. f (1965) ("The rule stated in this Section applies to *any person engaged in the business of selling products* for use or consumption") (emphasis added); *Bolduc v. Herbert Schneider Corp.*, 117 N.H. 566, 569, 374 A.2d 1187, 1189 (1977) ("*Persons in the busi-*

*ness of selling products* may be held strictly liable in tort") (emphasis added). As the *Bolduc* court indicated, "[c]ases in which ... airplane passengers have recovered under strict tort liability have involved the *manufacturer or seller thereof.*" *Bolduc, supra,* 117 N.H. at 569, 374 A.2d at 1189 (emphasis added and citation omitted).

The distinction between products and services is apposite to the determination of the instant issue. As previously noted, "New Hampshire's doctrine of products liability applies to persons engaged in the business of selling *products* for use or consumption." *Siciliano, supra,* 124 N.H. at 730, 475 A.2d at 25 (citing *Buttrick, supra*) (emphasis in original). In their complaint, plaintiffs allege that Business Express "is a business engaged in commercial aviation." Amended Complaint ¶ 17. Despite the fact that plaintiffs have propounded interrogatories to inquire into the accuracy of their own allegation, it is evident that any acquisition or sale of aircraft on the part of Business Express is merely an incidental component of their primary business venture—the provision of scheduled commercial air transportation. *See Bruce v. Martin–Marietta Corp.,* 544 F.2d 442, 448–49 (10th Cir.1976) (business of commercial air carrier is the provision of scheduled air transportation, not the merchandising or sale of aircraft). Thus in practical terms, Business Express does not sell or supply a product but rather "[i]t provides persons with a service, namely a ride on [an airplane]." *Siciliano, supra,* 124 N.H. at 730, 475 A.2d at 25; *see also Voelker v. United Airlines, Inc.,* No. 93–1653, 1993 WL 274012 at *3 (E.D.Pa. July 6, 1993) ("The transport of passengers from one city to another cannot be described as a product. It is the provision of a service and thus outside the scope of section 402A").

■ In light of the foregoing, it is clear that New Hampshire courts are not prone to extend strict liability beyond its traditional limitations. One of those historical limitations is the understanding that such liability will not attach to one who acts as a supplier of services. *See, e.g., Bolduc, supra,* 117 N.H. at 569, 374 A.2d at 1189 (ski area operator "is not the manufacturer or seller of

[a] tramway. He provides only a service, that is, transportation....").

■ The court hereby finds that Business Express qualifies as a supplier of services rather than a seller of products and, as a result, Business Express cannot be held liable under any of the strict liability theories advanced by plaintiffs. Likewise, "the fact that this case involves a nearly pure service transaction renders inappropriate, under the current state of the law, the plaintiff[s'] attempt to recover under the theory of implied warranty." *Id.* The motion by Business Express to dismiss the strict liability and breach of implied warranty claims alleged against it is therefore granted, and their motion to dismiss said claims due to insufficient notice, *see infra,* is therefore denied as moot.

### B. *Concord Commercial Corp. and Marketing Corp. of America*

Defendants CCC and MCA assert that their respective roles in the transaction were as companies engaged in equipment financing and marketing consulting/promotion. Appended to their motion to dismiss are the affidavits of corporate officers for the respective companies which attempt to validate the extent of CCC's and MCA's involvement in the acquisition and sale of the subject aircraft. Plaintiffs have likewise appended documents to their objection to the motion; namely, interrogatories aimed at determining the extent and scope of the leasing arrangement.

CCC and MCA assert that *Brescia v. Great Road Realty Trust,* 117 N.H. 154, 373 A.2d 1310 (1977), warrants the dismissal of the strict liability, implied warranty, and negligence claims presently pending against them. *Brescia* involved the lease of a crane between a construction company and a realty trust, both wholly owned by the same individual. *Brescia, supra,* 117 N.H. at 155–56, 373 A.2d at 1311. The fact that the leasing arrangement was a singular occasion was of critical importance. "[T]o the extent the doctrine [of strict liability] is applicable to a lease arrangement, it would seem to be applicable only where the lease in question represents something more than business happen-

stance on the part of the lessor." *Brescia, supra,* 117 N.H. at 157, 373 A.2d at 1312.

 When "matters outside the pleadings are presented," the court may convert the 12(b)(6) motion to a motion for summary judgment under Rule 56, Fed.R.Civ.P. *See* Rule 12(b), Fed.R.Civ.P. ("the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56").

 Since the affidavits appended to defendants' motion to dismiss will be considered, the court hereby converts the motion into a motion for summary judgment with respect to the strict liability, implied warranty, and negligence claims asserted against defendants CCC and MCA. As the court has previously enlarged the time for defendants to respond to plaintiffs' June 30, 1994, interrogatories to October 11, 1994, plaintiffs are granted until November 11, 1994 to submit any objection to defendants' motion for summary judgment.

*6. Notice of Warranty Claims*

By way of alternative argument, all defendants allege that plaintiffs either failed to give notice or gave insufficient notice per the requirements of New Hampshire Revised Statutes Annotated (RSA) 382–A:2–607 and as a result all warranty claims should therefore be dismissed. As an additional defense, Beech contends that a nonprivity consumer buyer must timely notify a remote manufacturer of the alleged defects. Thus, Beech asserts that even if the court finds the accident form constituted sufficient notice to Business Express,[12] the lack of any express notice to Beech should operate as a bar to relief on implied warranty grounds.

 The warranties of merchantability and particular purpose are subject to the notice provisions of the Uniform Commercial Code (UCC). *See Elliott v. Lachance,* 109 N.H. 481, 484, 256 A.2d 153, 155 (1969). This conclusion has become such a truism in New Hampshire law that neither party disputes the fact that notice is a prerequisite to maintaining a warranty action under the UCC. *See, e.g., Hooksett School Dist. v. W.R. Grace & Co.,* 617 F.Supp. 126, 132 (D.N.H.1984). Rather, the present dispute concerns the sufficiency of the notice provided by the plaintiffs prior to the commencement of this suit.[13]

 Under New Hampshire law, the determination of whether defendants received sufficient notice is ordinarily a question of fact to be determined by a jury based on the surrounding circumstances. *See Russell v. First National Stores, Inc.,* 96 N.H. 471, 475, 79 A.2d 573, 577 (1951) (construing sufficiency of notice under section 69 of the Uniform Sales Act, precursor to RSA 382–A:2–607(3), as a jury question); *Pineau v. White,* 101 N.H. 119, 121, 135 A.2d 716, 718 (1957) (same); *see also* 4 RONALD A. ANDERSON, UNIFORM COMMERCIAL CODE § 2–607:11 (1983 & Supp.1993) (as a general rule, sufficiency of notice is question of fact for the jury).

Therefore, Beech's motion to dismiss the breach of implied warranty claims based on lack of or insufficient notice is hereby denied.

*7. The Amended Complaint*

At the preliminary pretrial conference held on January 20, 1994, plaintiffs were granted leave to amend their original complaint so as to add Beech Aircraft Corporation as a named defendant. Although plaintiffs' amended complaint did include Beech as a named defendant, it also included two heretofore unknown entities, Concord Commercial Corporation and Marketing Corporation of America, as additional defendants, and also alleged several new theories of recovery; namely, strict liability and implied warranty. Defendants Business Express, CCC, and MCA object to these excessively broad

---

**12.** Despite the fact that the court has dismissed the implied warranty claims against Business Express, the issue of notice to Business Express is still relevant to the ultimate issue—whether such notice sufficiently preserved plaintiffs' warranty claims against Beech.

**13.** In this regard, the court notes that the notification rule is one "designed to defeat commercial bad faith, not to deprive a good faith consumer of his remedy." *Hooksett School Dist., supra,* 617 F.Supp. at 132.

amendments in contravention of the pretrial order and seek preclusion of same. Plaintiffs, on the other hand, note that leave to amend is within the sound discretion of the court and, to the extent that the amended complaint may have exceeded the scope of the pretrial order, such additional leave is now requested.

According to Rule 15(a), Fed.R.Civ.P., once a responsive pleading has been served, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party." However, courts are admonished that "leave shall be freely given when justice so requires." *Id.* Circumstances under which leave should not be so freely given include "undue delay, bad faith or dilatory motive on the part of the movant ... undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

 A review of the facts indicates that none of the forbidden factors are present. To the extent that plaintiffs' amended complaint exceeded the scope of the pretrial order, the court finds that such amendments cannot be classified as "futile or ... serv[ing] no legitimate purpose," so that denial would be appropriate. *See Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 59 (1st Cir. 1990). The court further finds that allowance of plaintiffs' additional claims will advance the cause of justice and " 'facilitate a proper decision on the merits.' " *Foman, supra,* 371 U.S. at 182, 83 S.Ct. at 230 (quoting *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)). Defendants' motion to dismiss plaintiffs' additional allegations is therefore denied.

### Conclusion

For the reasons set forth herein, defendant Beech's motion to dismiss (document 13) is denied in its entirety. The motion to dismiss filed by defendants Business Express, Concord Commercial Corporation, and Marketing Corporation of America (document 20) is (1) granted as to the strict liability (Counts III, IV, and V) and breach of implied warranty (Counts VI and VII) claims against Business Express, and is (2) converted into a motion for summary judgment as to the strict liability (Counts III, IV, and V), breach of implied warranty (Counts VI and VII), and negligence (Count I) claims alleged against Concord Commercial Corporation and Marketing Corporation of America. Plaintiffs shall have until November 11, 1994 to submit any objection to defendants' motion for summary judgment on these claims. Defendants' motion to dismiss is otherwise denied.

SO ORDERED.